| 93 | 27 |
| 103 | 595 |

| 93 | 27 |
| 153 | 1485 |

| 93 | 27 |
| 157 | 1 41 |

## THE PEOPLE v. IDA PETERSON.

*Criminal law—Change of venue on application of people—Evidence—Confessions—Instructions to jury.*

1. The circuit courts have the right, upon cause shown, to change the venue in criminal cases on the application of the people.
2. The court erred in instructing the jury that certain statements of the respondent, if made as testified by a witness for the people, were a virtual admission of the killing of her husband.

Error to Menominee. (Grant, J.) Argued June 29, 1892. Decided July 28, 1892.

Respondent was convicted of manslaughter, and sentenced to the Detroit House of Correction for 13 years. Reversed, and new trial ordered. The facts are stated in the opinion.

*B. J. Brown* and *E. P. Royce* (*H. O. Fairchild,* of counsel), for respondent.

*A. A. Ellis,* Attorney General, and *F. D. Mead,* Prosecuting Attorney (*R. C. Flannigan,* of counsel), for the people.

LONG, J. The respondent, in September, 1887, was convicted in the circuit court for the county of Menominee of the crime of manslaughter, and sentenced to the Detroit House of Correction for the period of 13 years. The information charged her with the murder of her husband, Alfred Peterson, on January 30, 1887, at Baldwin, in the county of Delta. Two trials were had before a jury in Delta county, and in each trial the jury disagreed. Upon application of the prosecuting attorney of Delta county, the circuit judge of that county granted a change of venue to the county of Menominee.

The first question upon this record is whether or not the court had jurisdiction upon the application of the State to grant the order transferring the case out of that county into another county for the purpose of trial. The showing made for a change of venue was that two trials had been had in Delta county, in each of which the jury had disagreed. This was made to appear by the affidavit of the prosecuting attorney, and he further stated, as shown by the affidavit, as follows:

"That the murder which the said respondent is charged with having committed was, and still is, a subject of deep interest to the people of said county; that the papers in said county, of which there are three, have discussed the alleged facts from time to time more or less fully; that the trials of said cause already had have attracted the attention of the people generally; that the citizens of the county have attended each of the trials in large numbers; that the facts and circumstances in said cause are so well known and have been so fully discussed by the inhabitants of the county, and more especially by the inhabitants of the city of Escanaba, the county-seat of said county, that the deponent believes it will be impossible to obtain a fair and impartial jury in said county to try said cause."

It cannot be said but that the question rested within the sound discretion of the trial court to judge and determine the sufficiency of this showing for a change of venue, if, under the Constitution and statutes of the State, the court has the right, without the consent of the respondent, in a criminal prosecution, to change the venue and transfer the trial into another county from that in which the offense is charged to have been committed. The Constitution of this State, by sections 27, 28, art. 6, provides:

"SEC. 27. The right of trial by jury shall remain, but shall be deemed to be waived in all civil cases unless demanded by one of the parties," etc.

"SEC. 28. In every criminal prosecution, the accused shall have the right to a speedy and public trial, by an impartial jury. * * *"

It will be observed that our Constitution contains no express provision as to the place of trial of offenders, as do the constitutions of some of the other states. The constitution of Wisconsin provides that persons accused of crime shall be entitled to—

"A trial by an impartial jury of the county or district wherein the offense shall have been committed, which county or district shall have been previously ascertained by law."

It was held by the supreme court of that state in *Wheeler v. State,* 24 Wis. 52, that a change of venue could not be granted by the court against the objection of the respondent.

The question has never before arisen in this State. It was said, however, in *Swart v. Kimball,* 43 Mich. 449, by Mr. Justice COOLEY: "It has been doubted in some states whether it was competent even to permit a change of venue, on the application of the state, to escape local passion, prejudice, and interest;" citing *Wheeler v. State, supra.* Mr. Justice COOLEY, however, remarked in the same case, after the statement above quoted: "This may be pressing the principle too far."

There can be no doubt that it was the intent of the framers of the Constitution of this State, in providing that "the right of trial by jury shall remain," that such right of trial by jury was to remain as complete and certain as the right existed at the common law. The Legislature, in defining the powers of the several circuit courts, provided that "each of the said courts, upon good cause shown, may change the venue in any cause pending therein, and direct the issue to be tried in the circuit court of another county," etc. It is provided by the same section of the statute that the court to which such cause shall be removed shall proceed to hear, try, and determine the same, but that, in criminal cases so transferred, the court awarding sentence shall direct that the defendant be imprisoned

in the common jail of the county in which the prosecution commenced. It is further provided by the same section of the statute:

"And, when there shall be a disagreement of the jury on the trial of any criminal cause in the circuit court to which such cause was ordered for trial, the circuit judge before whom the same was tried, if he shall deem that the public good requires the same, may, upon cause shown by either party, order and direct the issue to be tried in the circuit court of another county in the State." How. Stat. § 6468.

It will be seen that by this statute the circuit courts are authorized to award a change of venue in all cases upon cause shown. This statute is but declaratory of the common-law power vested in the circuit courts of this State. It is said by Bishop, in his work on Criminal Procedure, that the change of venue is usually ordered on application of the prisoner, first giving notice to the prosecuting officer, and then supporting the application by affidavits; but it may equally be ordered, in the absence of any provision of written law to the contrary, when applied for by the representative of the government. 1 Bish. Crim. Proc. § 73. In support of this doctrine are cited *People v. Webb*, 1 Hill (N. Y.),179; *People v. Baker,* 3 Parker, Crim. R. 181. In *People v. Webb, suprà,* it was held that a change of venue might be awarded by the court on application of the state, on motion of the public prosecutor, if it appeared that a fair and impartial trial could not be had in the county where the indictment was found. We think it is well settled that, where there is no constitutional provision fixing the vicinage within which the trial must be had, the rule of the common law must prevail, unless changed by statute, and that under their common-law powers the circuit courts have the right, upon cause shown, to change the venue upon the application of the people. The court was not in error, upon the showing made, in directing a

change of venue for the trial to the county of Menominee.

It appeared upon the trial that the respondent, for several years before her marriage, had led a somewhat irregular life, and was, until within a short time previous to her marriage, an inmate of a house of prostitution at Escanaba and other places. She married the deceased in the fall of 1886, and lived in Escanaba two or three months, and about two weeks previous to the homicide went to live with her husband in the house of one Peter M. Peterson, some four miles from Brampton, where the deceased had work. On the night the homicide was committed the only inmates of the house were Peter M. Peterson, the respondent, and her husband. Mrs. Peterson and her husband slept in a bedroom below, Peterson sleeping on the floor above. The deceased was killed about 5 o'clock in the morning by a blow from an axe or some other sharp instrument upon the side of his head, leaving a wound extending from the right eye to his ear. Peter M. Peterson was one of the principal witnesses in the case. His testimony tended to show that the respondent and her husband had been drinking the night before, the respondent becoming considerably intoxicated and quarrelsome, her husband having some difficulty in controlling her; that in her drunken frenzy in the evening she had threatened her husband with violence; that respondent and her husband slept together in the same bed, and during the night witness had been frequently disturbed and kept awake by their quarreling; that about 5 o'clock in the morning the respondent called to him for help, claiming that her husband had done away with himself; that, upon descending to the room below, he found Alfred Peterson with the wound upon his head, as above described, in a dying condition, and the respondent with her night-dress bespattered with blood; that he returned to his chamber for his clothing, intending to summon assistance,—as importuned by the respondent to do,—and when

he descended found that the respondent had left the house, and gone to a neighbor's, and accused him of the crime. The axe with which the blow was evidently struck was found subsequently where it had been thrown into the snow some distance from the house.

The respondent was sworn as a witness in her own behalf upon the trial, and testified that during the week previous to the homicide Peter M. Peterson had importuned her to leave her husband, get a divorce, and then live with him; that he had made her several presents during ·the week, which upon the night before the crime she had shown to her husband, and over which her husband and Peter M. Peterson had had some words, and her husband had threatened to do Peterson some injury. Her testimony in reference to the killing of her husband is that she was awakened about 5 o'clock in the morning by Peter M. Peterson; that he stood beside her, pressing a knife against her throat; that he struck her with the knife on the chin; that she then crawled under the bed-clothes, and rolled off the side of the bed, Peter M. Peterson still striking at her with the knife; that when she got from under the bed she put her hands upon her husband's legs, and said to him, "Get up, Alfred, quick;" that he turned his head over, and, as he did so, he raised his hands, and said, "Get me a handkerchief;" that she then took her night-dress, and put it up to his face, when Peter M. Peterson said, "I will go up-stairs, and get my revolver and finish you;" and as he started to go she ran out of the door, and went to a neighbor's.

After the respondent's arrest she was taken to the county jail, where it is claimed she made certain statements in reference to the occurrence at her house that night, which it is claimed are contrary to her testimony given upon the trial. Witnesses were called who detailed these several conversations had with her, and which tend strongly to

contradict the theory of her defense.    It was also shown
upon the trial that she had a conversation with one Mrs.
Warne, who had charge of the woman's department at the
jail, while respondent was awaiting her trial.    Mrs. Warne
testified at some length to these conversations and statements
of Mrs. Peterson to her, concerning how the tragedy occurred.
The court, in reference to this testimony of Mrs. Warne,
in his general charge, stated to the jury:

"It is claimed by the people that this respondent, shortly
after her arrest, made statements in regard to this trans-
action which are inconsistent with the story she now tells
in court.    Any statements made by the respondent volun-
tarily are very important for you to consider.    If she made
the statements as testified to by Mrs. Warne, it is, of course,
a virtual admission of the killing of her husband; if she
did not, of course, that testimony goes for naught."

It is insisted upon the argument here that the testimony
of Mrs. Warne did not warrant the court in directing the
jury that such testimony, if believed, was a virtual admis-
sion by respondent of the killing of her husband; that the
statements made by the respondent to Mrs. Warne, taken
as a whole, did not amount to a confession of guilt; and
that, therefore, the respondent's case was prejudiced before
the jury by the remark of the court.    The essential part
of the testimony of Mrs. Warne, in reference to this
claimed confession, is as follows:    She was asked the ques-
tion:

"What did she tell you?
"A. 'Well, nobody saw me when I struck the blow.
How are they going to prove it against me?    I guess I am
all right, as they didn't see me do it.'"

This was on her direct examination.    On her cross-exam-
ination she was asked why she had not made this statement
on the former trials, and she responded that the question
was not asked her.    It appeared that she was examined on

93 MICH.—3.

the former trials, and gave testimony as to various conversations she had had with the respondent, and made no mention on those trials of this claimed confession. On her cross-examination in the present case the following occurred:

"*Q.* Now, Mrs. Warne, have you attempted to give to the jury the very words she said,—'No one saw me when I struck the blow?'

"*A.* I think, just as near as I can possibly recollect, and I think I recollect that all right.

"*Q.* You have frequently spoken of it since, have you?

"*A.* Well, I didn't speak of it at all until they called my attention to it afterwards. I say they didn't ask me to swear to it.

"*Q.* Did she use those words, 'No one saw me strike the blow, and how are they going to prove it against me?'

"*A.* She said to me—

"*Q.* Just answer my question. Did she use those words?

"*A.* I think she did; I can repeat them, if you wish me to.

"*Q.* Just answer my question. 'No one saw me strike the blow, and how are they going to prove it against me?' Did she use those words?

"*A.* Yes, sir.

"*Q.* Just exactly? I want you to be positive about the exact words which she said; go on and repeat the words.

"*By the Court:* Are those the exact words she used, Mrs. Warne?

"*A.* Yes, sir.

"*Q.* 'And how are they going to prove it against me?' Those are the exact words?

"*By the Court:* That was in the other question. Did she say that?

"*A.* Yes, sir.

"*Q.* 'I guess I am all right, for they cannot prove it when no one saw me do it?'

"*A.* Yes, sir.

"*Q.* Is that all she said to you about that?

"*A.* Well, it might not have been all she said.

"*Q.* Is that the language she used when she told you?

"*A.* That is the language she used when she told me.

"*Q.* There is not another word in it than what you have related just now?

"*A.* I couldn't say there was not another word in it.
"*Q.* But that is all, isn't it?
"*A.* That is all; yes, sir."

This is the substance of the testimony given, which the court directed the jury was a virtual admission of the killing of respondent's husband.

Deliberate confessions of guilt are among the most effectual proofs in the law. Their value depends on the supposition that they are deliberate and voluntary, and on the presumption that a rational being will not make admissions prejudicial to his interest and safety, unless when urged by the promptings of truth and conscience. Such confessions, so made by a prisoner to any person at any moment of time and at any place subsequent to the perpetration of the crime, and previous to his examination before a magistrate, are at common law received in evidence as among proofs of guilt. "But," says Mr. Greenleaf in his work on Evidence, "the evidence of verbal confessions of guilt is to be received with great caution; for, besides the danger of mistake from the misapprehensions of witnesses, the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue confession." 1 Greenl. Ev. § 214.

With these rules in mind, and the danger there may be, as pointed out, in the misuse of words and the failure of the party to express his own meaning, we may well examine these statements with care. Taking the claimed confession as first stated by Mrs. Warne, it is very doubtful that the respondent intended to be understood by Mrs. Warne as confessing her complicity in the killing of her husband. The statements of the respondent to Mrs. Warne, just prior to the use of these words, tend strongly to show that she

did not intend to convey that impression to the mind of the witness. According to Mrs. Warne's testimony, the respondent had charged the crime upon Peterson. She stated to her that when she was awakened from her sleep Peterson stood by the bed striking at her with a knife; that he had an axe in his hands, and was chopping her husband; that she crawled under the bed-clothes, when Peterson stabbed at her through the bed-clothes, and she got under the bed, and when she came out she found her husband bleeding from the wound in his head. It was in this connection that Mrs. Warne testifies the confession was made. It is impossible to believe that the respondent intended by the language employed by her,—even if she used the language stated by Mrs. Warne in her direct examination,—to be understood as saying that she killed her husband, but rather that, as no one saw her do the act, it could not be proved against her.

But the question does not need to rest there. On Mrs. Warne's cross-examination she entirely changes the testimony, and, if the true version was there given by her, the language is entirely stripped of its incriminating character. That language is: "I guess I am all right yet, for they cannot prove it when no one saw me do it." These statements must all be taken together, and, when so considered, they fall far short of a confession of guilt. The rule above stated may well be applied to this case, and the court should not only have directed the jury to take them with great caution, but should have directed the jury that the claimed confession to Mrs. Warne could not be taken as a confession of guilt.

It appears that, after the murder was committed, the axe with which it was done was found thrown some considerable distance into the snow. There were no tracks leading very near to it, the proofs showing that it might have been thrown from one part of the path from the house, or from

another. It was contended that the distance was so great that the respondent could not have thrown it there. Experiments were made by different parties in throwing it, and this was shown by testimony introduced before the jury. Upon this the respondent's counsel asked the court to instruct the jury:

"If the axe was thrown such a distance as they are satisfied that the defendant could not throw it, then that should satisfy them that the defendant is not guilty."

This instruction was refused, but the court directed the jury that they should weigh such testimony, "for, if it were impossible for the one who committed that deed to throw the axe that far, it would be a strong circumstance to show that the party was not guilty."

Every circumstance developed on the trial showed that the person who committed the crime actually did throw the axe. It was shown no other could have thrown it away; and, if the jury were satisfied that the respondent could not have thrown it where it was found, they were bound to acquit. It was something more than a strong circumstance. It was conclusive proof, by the facts developed upon the trial, that the respondent could not have been guilty of the offense if she could not have thrown the axe where it was found. The court was in error in refusing this request.

These are the only errors we find in the record.

The conviction and sentence must be reversed, and a new trial ordered.

MORSE, C. J., McGRATH and MONTGOMERY, JJ., concurred. GRANT, J., did not sit.