Commonwealth *v*. Reilly et al.

Commonwealth *v*. Baltz et al.

Argued December 16, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles J. Margiotti*, Attorney General, with him *Edward Friedman, E. Russell Shockley*, Deputy Attorneys

General, *D. W. Henderson* and *Wade K. Newell,* for Commonwealth.

*E. C. Higbee* and *John Duggan, Jr.,* for respondents.

OPINION BY MR. CHIEF JUSTICE KEPHART, December 19, 1936:

A presentment of the grand jury of Fayette County set forth that on September 12, 1936, Frank C. Monaghan, suspected of having committed a felonious assault on John C. Wall, county detective, was arrested by policeman Charles Malik and Lewis Ford, at the direction of James A. Reilly, district attorney of Fayette County. That Monaghan, also at the direction of the district attorney, was then taken to the bertillon room of the office of the county detectives in the basement of the courthouse and while in the custody of the officers, was feloniously assaulted and killed. Based on this presentment, indictments were found by the grand jury against the defendants, the district attorney, assistant district attorney, coroner, two members of the state police, county detectives and other prominent persons of Fayette County. The Attorney General, as prosecuting officer, subsequently presented a petition to this Court averring that by reason of the facts and circumstances therein narrated it would be impossible to secure a trial free from underlying influences, prejudices, or partiality, and praying for a change of venue. We are asked to issue our writ of certiorari to remove the record in this case into this court and to certify it to a court in some outside county. An answer was duly filed. We will discuss both petition and answer, later turning our attention to the principal question involved.

The petition of the Attorney General and his associates avers as follows: The Attorney General was requested by the Judges of Fayette County and directed by the Governor of the Commonwealth of Pennsylvania to cause an investigation to be made of the death of

Frank C. Monaghan. Pursuant to this request, he conducted the inquiry and presented sufficient evidence to cause a presentment to be made to the court recommending that bills of indictment be drafted and submitted to the Grand Jury charging James A. Reilly, Harry W. Byrne, Wilbert R. Minerd, Charles Malik, J. A. Hann, Stacey Gunderman and Anthony Sanute with the wilful, malicious and unlawful killing of Frank C. Monaghan and charging Dr. S. A. Baltz, Dr. C. Corrado, Dr. H. E. Ralston, Stephan A. Haky and Andrew Haky with being accessories after the fact in the unlawful concealment and aiding to conceal the unlawful killing of Frank C. Monaghan. True bills of indictment were found by the Grand Jury and the cases were set for trial on January 4, 1937. Two hundred jurors have been summoned in a special panel for the trial of these cases.

James A. Reilly, the district attorney and his associates, the defendants above named, are all alleged to be widely known throughout the County of Fayette, and to have each a large personal following, political, professional and social which would make it impossible to secure a jury that would not be influenced by the friends, acquaintances and members of the family of these defendants.

It is charged that a concerted effort is being carried on by the defendants and other persons prominent in public life in the county to create sympathy for the defendants and prejudice against the Commonwealth at the trial that is to take place. These efforts are evidenced by public meetings of a Nonpartisan League which were held at Allison, Fayette County, on Sunday, October 4, 1936, while the grand jury was in session. Three thousand members, it is stated, were in attendance at these gatherings and resolutions were adopted and published in certain newspapers of the county with headlines such as "Reilly given vote of confidence," "Nonpartisan league backs district attorney and his associates," "Public officers and newspapers denounced in

resolutions." These resolutions praised Mr. Reilly and his administration and condemned the Commonwealth's officers and its efforts to prosecute him. A similar meeting was held at Arnold at which more than one thousand people attended and adopted similar resolutions. These were likewise published in newspapers in that county. The Nonpartisan League is alleged to have a total membership in the county of thirty thousand.

That two proceedings were instituted to oust the Attorney General as prosecutor, both allegedly for the purpose of prejudicing the Commonwealth in continuing its investigation and prosecution of the indictments already returned by the grand jury. With reference to motions made to quash the indictments it is alleged that they contained impertinent, scandalous and immaterial matters and were published in the morning newspapers in Uniontown and Pittsburgh before they had been filed in court. That after the indictments were returned, certain newspapers published glaring headlines which had the effect of prejudicing the citizens of Fayette County against the Commonwealth and Attorney General in connection with these cases. These headlines read, "Reilly hurls challenge at Margiotti," "Margiotti ordered to appear in court," "Margiotti rapped by Duggen," "Hope to have Margiotti ousted," "Reilly battles Margiotti," "Margiotti reigns in Fayette County," "Judge DUMBAULD opposes Margiotti's appointees," "Judge recognizes Reilly's appointees." Other items were published by the press relating to the sum demanded for bail and charging the Attorney General with being a "Shylock" and attempting to imprison seven "good citizens." We cannot here narrate all the newspaper articles of an inflammatory nature set out in the Attorney General's petition, as they would unduly prolong this opinion, but they contain, inter alia, a statement by the assistant district attorney that "Margiotti is a ruthless prosecutor"; and, in another article, it is asserted, "A dozen of its [the county's] best citizens have been indicted for a

murder they did not commit." One of the articles stated, "We do not presume to know what the defense will be in this case, but we are satisfied that it will clear the accused officers of having wilfully and brutally beaten Monaghan to death. . . . But what makes this case more brutal than the alleged slaying, is the indictment of persons who could be connected with the case only by the wildest imagination and the faintest technicality." Lengthy praises of the defendants are contained in many of the comments.

Various county officers, not indicted, but interested in the defendants, according to the petition, have taken unusual steps to show their disapproval of the Attorney General's part in the case. These too were published in certain newspapers of the county. The voters were influenced, it is claimed, against the Commonwealth because of the emphasis placed by the county controller on the cost of the case to the county, the newspapers carrying statements that it would range anywhere from $25,000 to $250,000.

It is further charged that friends of the defendants have taken steps to intimidate the judges and the Attorney General and that this is demonstrated by newspaper articles inspired by them. It is alleged that large sums of money for the defense have been and are being raised by numbers racketeers, located in Fayette County, who are stated to be sympathetic with and interested in the defendants. These racketeers, it is asserted, agreed to raise $17,500, and labor and other organizations are said to be similarly raising money for this purpose.

It is averred that a state senator, a member of the bar who is a political leader, and a judge of the common pleas court, all of Fayette County, stated to the Attorney General that since the district attorney had been indicted along with the other defendants, no conviction could be had of any of the defendants, irrespective of their guilt. That the Judges of Fayette County, disregarding the suggestion of this Court that Reilly, the dis-

trict attorney, be generally superseded in his work, as such officer, while charged under an indictment for murder, recognized Reilly and his appointments and ignored the appointees of the Attorney General who were lawfully acting. It is averred that persons interested in behalf of the defendants have threatened physical violence to two material witnesses for the Commonwealth. Finally, that conditions in Fayette County are becoming progressively worse and that members of social, political, religious, industrial and other organizations are actively interested and partisan, so that a fair and impartial trial cannot be had of these cases in Fayette County.

The answer denies many of the averments in the petition. The publication of the various newspaper articles related in the petition is not denied, but defendants say they are in no way responsible for them. They also allege without hesitation that a fair trial may be obtained in Fayette County.

It is denied that it will be impossible to secure jurors who will not be acquainted or friendly with the defendants, and it is alleged that the fact that they have good reputations in the community is no reason for denying them a trial by jury in Fayette County. Defendants deny in toto that persons prominent in public life in the County of Fayette are attempting to create sympathy for them or, if this has been done, that it has been done with their consent.

While the public meetings and resolutions were admitted, they deny responsibility for them or that these meetings were for the purpose of prejudicing the Commonwealth.

The defendants admit instituting the motions to quash and quo warranto proceedings but deny that the allegations therein were impertinent, scandalous or made to prejudice the public, and assert that they were made in good faith and on information. They aver the defendants are not charged in the petition with responsibility

for the articles relating to the cost to the county for the prosecution of these cases. They allege, however, that the financial condition of the county is such that grave fears are entertained as to its ability to meet these obligations. They assert that the criticism by the county controller of the Attorney General should not be attributed to them, and deny any participation in a scheme to prejudice the minds of the citizenry of Fayette County by reason of the prospect of expense to the county.

They deny also that money is being raised for their defense by a group of racketeers or by any other organization, and aver, on the contrary, that the sum of money raised to date for counsel fees and expenses amounts to but $480. They claim there is nothing to show that any organizations have contributed to the support of the defendants or that any amounts have been publicly contributed.

Defendants deny personal knowledge of the statements alleged to have been made to the Attorney General with reference to the probability of convicting the various defendants because of the inclusion of the district attorney in the indictment. They state that, having interviewed the parties named, the allegations were not in fact made as set forth in the petition.

They deny that organizations are actively interested on their side of the case, that conditions are in any way becoming worse in the county, or that physical violence has been threatened to any of the witnesses for the prosecution.

They deny that an unfair trial will result if the case is tried in Fayette County, and aver that any publicity which has attended the proceedings is directly attributable to the actions of the Attorney General who, they allege, was constantly attended by a corps of newspaper reporters to whom he gave daily interviews, as appears by Pittsburgh papers handed to the Court quoting the Attorney General.

They further aver that a large number of inhabitants in Fayette County are of Italian extraction, and that the Attorney General is personally acquainted with them. With respect to his assistants, defendants aver that they likewise are well known in the community and county by reason of political and fraternal activities. They charge that newspaper interviews prompted by the Attorney General have a large circulation throughout the entire western part of the State and that any effect that they may have on the people of Fayette County would likewise be found in other counties in that district. Finally, that an advertising campaign has been assiduously waged by the Attorney General, and that his actions have been motivated by a desire for personal aggrandizement.

The petition and answer raise this question: May the Commonwealth secure a change of venue in a criminal prosecution for the reason that it cannot secure a fair and impartial trial in the county in which the indictment is found? In this question is involved the power of this Court, on such application, to issue its writ of certiorari to bring the record from the county for the purpose of ordering it transferred to another county. Similar petitions have been before the court in other cases both on application of the accused and of the Commonwealth. In the latter applications the venue was changed in one and in two others was refused, the court being satisfied that, with the assistance of elisors, the Commonwealth would secure a fair and impartial jury.

Defendants claim that the change, if granted, would invade their constitutional rights under Article I, Section 9, of the State Constitution and Amendment VI of the Federal Constitution. The former secures a speedy trial before an impartial jury of the vicinage. Blackstone states that at common law the accused traditionally had the right to be tried by a jury of the vicinage. When trial by jury began jurors were freeholders of the hundred who were familiar with the crime, the parties

to it and the witnesses, but, as time advanced, it became apparent that the advantages derived from a jury so selected were overcome by the tendency of the juries "to intermix their prejudices and partialities in the trial of right." For this reason courts and Parliament gradually extended the area from which jurors could be drawn, although they were still termed jurors of the vicinage: Blackstone, Commentaries, Book III, pp. 359-60. In this country and England, the common law right of trial by jury of the county or vicinage was not unconditional, but the trial might be removed to another county upon application of either the crown, the prosecution or the accused when it was thought to be necessary to assure a "fair and impartial trial": see *Rex v. Harris*, 3 Burr. 1330; *Rex v. Nottingham*, 4 East. 208; *Rex v. St. Mary's on the Hill*, 7 T. R. 735; *Hewitt v. State*, 43 Fla. 194, 30 So. 795; *People v. Peterson*, 93 Mich. 27, 52 N. W. 1039; *State v. Miller*, 15 Minn. 344; *State v. Holloway*, 19 N. M. 528, 146 P. 1066; *People v. Webb*, 1 Hill (N. Y.) 179. Contra: *People v. Powell*, 87 Cal. 348, 25 P. 481; *In re Nelson*, 19 S. D. 214, 102 N. W. 885.

In most states of the Union and under Federal authority, the constitutions fix the area within which the trial must be had or from which the jury must be empanelled. Some merely provide that the accused shall have an impartial trial or that the right of trial by jury shall remain inviolate. In the states where the constitutions expressly require the jury to be drawn from a defined area, there is a difference of opinion as to the effect of these provisions, such as the jury shall come from the *"county"* or *"district,"* upon the right of the prosecutor to secure a change of venue where the accused objects. The Federal Constitution (Amendment VI) provides that the accused shall be entitled to a trial "by an impartial jury of the State and district wherein the crime shall have been committed." This amendment has been held not to be a limitation on the state courts but to

apply exclusively to federal criminal procedure: *Gut v. State,* 9 Wallace 35; *Gaines v. Washington,* 277 U. S. 85; *Ughbanks v. Armstrong,* 208 U. S. 481.

Article I, Section 9, of our Constitution provides that in all criminal prosecutions the accused has the right to a "speedy trial by an impartial jury of the vicinage." To sustain this right three elements must meet—a speedy trial, an impartial jury, and one coming from the vicinage. If any of these be omitted, the accused's constitutional right is not complete. He is not entitled to a delayed trial or one by a partial jury of the vicinage. The vicinage must be so composed in area as to give an impartial trial.

"Venue" means the county or jurisdiction in which the action is brought for trial. "Vicinage," used in our Constitution, is found in few others and is of uncertain meaning. It is not co-terminus with a county and may, in fact, embrace more than one county; this is clearly established by our case of *Commonwealth v. Collins,* 268 Pa. 295. It is there pointed out that the word is of "vague and indefinite meaning as applied to the territory from which jurors are to be summoned. . . ." Chief Justice BROWN said: "The primary and literal meaning of vicinage is neighborhood or vicinity, but neither of these terms definitely indicates just what territory it embraces. What to one man might be the neighborhood or vicinity in which an act is committed, might to another be regarded as far distant from it. A county, on the other hand, is a definitely designated territory. Originally it was the domain of a count or earl, but now it is a definite subdivision of the state, for political or administrative purposes, having fixed boundaries as established by the legislature, and what is embraced within it cannot be a matter of doubt or uncertainty. In this respect its meaning is vitally different from that of vicinity."

While vicinage comprehends or includes the venue as is shown by *Commonwealth v. Collins,* supra, the two are

not necessarily co-extensive. The main consideration is to give a speedy trial before an impartial jury drawn from an area broad enough to secure it. Therefore vicinage must expand itself to meet that situation and when, for potent reasons, the locality of the venue cannot produce such a jury, the venue must be moved within the vicinage to the place where an impartial jury can be obtained. While we are not compelled, at this time, to define with exactness the extreme limits of "vicinage," enough has been said to demonstrate the trial may be removed to another county or venue, without sacrificing this constitutional guarantee.

In the states where the constitution provides that the jury shall be drawn from the "county" or "district" in which the offense is alleged to have been committed the higher courts do not agree on the right of the prosecutor to have a change of venue, though these words are much more significant and capable of exact definition than in our constitution. Some jurisdictions limit the right to change of venue to the accused alone and deprive the prosecutor of such relief. See *Ex Parte Rivers,* 40 Ala. 712; *Osborn v. State,* 24 Ark. 629; *People v. Powell,* supra; *Miller v. The People,* 230 Ill. 65, 78; *State v. Knapp,* 40 Kans. 148; *In re Nelson,* supra; *Kirk v. State,* 1 Coldw. 344 (Tenn.); *State v. Greer,* 22 W. Va. 800; *Wheeler v. State,* 24 Wis. 52; see also *State v. Albee,* 61 N. H. 423. In one of these cases, *People v. Powell,* supra, where it was held that the prosecution had no right to a change of venue, the court stated that the effect of its holding would be that "when no jury can be obtained in the county, a defendant [could] be discharged or held in confinement for an indefinite time, until such changes take place in the county that a jury can be had." Such constitutional interpretation has no regard for the purposes of the instrument which is to sustain government. How is that possible if law and order is not preserved?

There are other states where, under constitutional provisions similar to the above, courts have held a change of venue may be permitted upon the petition of the prosecutor: *State v. Holloway*, supra; *State v. Durflinger*, 73 Ohio St. 154; *Commonwealth v. Davidson*, 91 Ky. 162; *State v. Hewitt*, supra; *People v. Paterson*, supra; *State v. Miller*, supra; see 3 Va. Law Reg. (N. S. 1917), p. 8. The conclusions in these cases are more consonant with sound reason and support the institutions they are designed to protect.

As we have stated, however, the right under our constitution is a trial by an "impartial jury of the *vicinage*." In *State v. Miller*, supra, the court stated: "The attorney general has well shown . . . both upon reason and authority that the constitution as much presupposes the existence in the county of the elements of an impartial jury as of the county itself, and that where they do not exist this clause is inapplicable." And, in *Commonwealth v. Davidson*, supra, it was pointed out: "It is a trial by an impartial jury of the vicinage that is guaranteed to the accused, not a partial jury, nor a jury deterred by lawless men from rendering an impartial verdict, nor such a jury as the officers of the law, who are prevented by lawless men from summoning impartial juries, would select." The basic reason for such construction is thus stated: "While the right is expressly given to the accused to a trial by a jury of the vicinage or county, it seems that each citizen should be deemed to have consented that the Commonwealth should reserve the power to enforce its laws; and if it should become essential to their enforcement that the Commonwealth should take a change of venue the same should be done." As further stated in that case: "Imagine the pitiableness of society with the accused, his friends, relations or sympathizers, impregnating the public mind with prejudice to such an extent that an impartial jury could not be obtained in the vicinage, and then the trial of the accused by those men, else not at all. . . . The right of

the Commonwealth in each case exists upon the ground of the necessity of preserving and enforcing its authority." The preservation of society, the enforcement of law and order in great crises would be severely impeded if our constitution would be so construed as to prevent in any case the Commonwealth from having a change of venue. But that right cannot be abused. The accused cannot be dragged all over the Commonwealth at its suggestion to be weighted down with the burden of an expensive trial. For this reason the prosecution's request for a change of venue should be much more strictly scrutinized than one by the accused; before the court is moved to act, there should be the most imperative grounds.

In connection with Article I, Section 9, there must be considered also Section 6 of Article I. It provides that "trial by jury shall be as heretofore and the right thereto shall remain inviolate." Both of these sections were in the constitution of 1838 in identical language. In *Byers & Davis v. Commonwealth*, 42 Pa. 89, this court said of this provision: "The founders of this state brought with them to their new abode the usages to which they had been accustomed in the land from which they emigrated. Among them was trial by jury. That mode of trial had long been considered the right of every Englishman, and it had come to be regarded as a right too sacred to be surrendered or taken away. Even in England it was fundamental or constitutional, so far as any right can be where there is no written frame of government. Its extent and its privileges, how and when it was to be enjoyed, were perfectly understood, *and in bringing it with them the founders of the Commonwealth doubtless intended to bring it as they had enjoyed it. None of the framers of government or constitutions under which we have lived have contemplated any extension of the right beyond the limits within which it had been enjoyed previous to the settlement of the estate or the adoption of the Constitution.* No intention to enlarge it appears in

the laws agreed upon in England in 1682. Our first Constitution, that of 1776, declared that 'trials by jury shall be *as heretofore.*' The Constitution of 1790, and the amended one of 1838, adopted substantially the same provision. Their language was, 'trial by jury shall be *as heretofore,* and the right thereof remain inviolate.' All looked to preservation, not extension."

The Constitution of 1790, Article V, Section 5, provided as to the right to remove cases to the Supreme Court by certiorari, the "party accused as well as the Commonwealth may under such regulations as shall be prescribed by law remove the indictment and proceedings and transcript thereof into the Supreme Court." While this right to the Commonwealth did not appear in later constitutions it was a common law right which was recognized as inherent in our common law system when we became a state and, since it is apparent that the purpose of our Constitutional provision was to codify the common law and to secure to the accused the jury trial as it existed when our state was first formed, it follows that the right of the prosecutor is equal with that of the accused to move for a change of venue. Courts must be ever watchful to protect rights of defendants accused of crime, but it is not necessary to construe the Constitution so as to defeat the ends of justice and cause law and order to be helpless.

We have consistently held that our power to change the venue is not affected by the provision that the legislature is empowered to enact laws governing such change. As has been often stated, the Act of May 22, 1722, 1 Sm. L. 139, confers powers on this court in criminal matters which are most extensive. In *Commonwealth v. Balph,* 111 Pa. 365, we stated: "What are the powers of the King's Bench as it existed in England, where the Act of 1722 was passed? We all know in a general way that it was the Supreme Court of Oyer and Terminer and General Jail Delivery; that when it sits in any county it outranks and supersedes

any other criminal court there sitting . . ." [and citing Blackstone] 'Into this court also indictments from all inferior courts may be removed by writ of certiorari, and tried either at bar or at nisi prius by a jury of the county out of which the indictment is brought.' . . . It possesses the inherent power of removing by certiorari the record and proceedings of any criminal case from the inferior court at any stage of the proceedings. After a case has been so brought into the King's Bench it may be tried at bar, or at nisi prius by a jury from the county from which the record was brought, *or if it is suggested upon the record and proof by an affidavit, that an impartial trial cannot be had in such county, the record may be remanded to another county for trial.*"

The Constitution of 1874 made no change in the broad power of this court to direct its certiorari to issue in a criminal case. This has been definitely decided in many cases. In *Commonwealth v. Balph,* supra, we said: "That the same power exists now is beyond controversy. From all that has been said it would seem to be clear that the only change which the constitution makes in our powers in criminal cases, is to prevent our trying indictments in the nisi prius." Article V, Section 3 of the Constitution expressly gives this court such power to issue its writ of certiorari "as is now or may hereafter be provided by law."

Article III, Section 23, reads: "The power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law." The Act of March 18, 1875, P. L. 30, relates only to change of venue upon application of the defendant. It has been urged, as it was years ago, that this statute delimits the power of the court, but we held that our power to grant this relief on certiorari is independent of the Act of 1875 and is not impaired thereby: *Commonwealth v. Smith,* 185 Pa. 553; *Quay's Petition,* 189 Pa. 517; *Com. v. Ronemus,* 205 Pa. 420. In *Quay's Petition,* supra, Justice STERRETT said, at pp. 540-541:

"We have repeatedly held that when a proper case for the exercise of the supervisory power invoked by these petitioners [for certiorari] is presented, it is still our duty to grant relief by sending the record to the proper court of another county for trial or detailing one of our justices to preside at the trial as the circumstances of each meritorious case may appear to require."

In *Commonwealth v. Smith,* supra, Justice MITCHELL said that the Act of 1875 did not in any way deprive the Supreme Court of its power to act but it made the occasions for its use fewer, as defendants could obtain relief from the court below upon cases within the statute. This followed a similar ruling of Lord ELLENBOROUGH in *Rex v. Nottingham,* supra. It was there held that the English statute is not intended to abrogate the power of that court in any way but merely to confer a new power on the court of oyer and terminer. We are therefore of the opinion and conclude that the Supreme Court has the power to change a venue from one county to another upon the application of the Commonwealth, the only limitation thereon being that the change must be within the vicinage in which an impartial jury may be obtained.

In the present case the Commonwealth alleges, apart from the action of a majority of the court below in failing to recognize the Attorney General's appointees in superseding Mr. Reilly while under indictment, which was clearly wrong, many acts on the part of defendants and their sympathizers which have created the development of a factional and partisan opinion throughout the county. The defendants, on the other hand, counterattack these allegations by asserting that the Attorney General and his legal associates have themselves fomented such feeling through the medium of newspaper interviews and similar methods. The question before the Court at present, however, is not as to who is the more justified in these criminations and recriminations, or the most to blame for the condition which exists, but whether the general atmosphere in the county is in fact

such that an impartial trial cannot be had. The imperative necessity is not to apportion responsibility for the present state of affairs or to penalize either side because of it, but to take the necessary measures to assure a fair trial, which is vital for the interests of Commonwealth and defendants alike. We have carefully reviewed the petition and answer and are all of one mind that neither the Commonwealth nor the defendants could secure a fair trial in the venue of Fayette County, and will therefore make an order changing the venue to another county where, in our judgment, an impartial jury may be secured.