1998-NMCA-018

953 P.2d 737

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Gordon HOUSE, Defendant–Appellant.**

Nos. 16913, 16918.

Court of Appeals of New Mexico.

Nov. 20, 1997.

Certiorari Granted Jan. 14, 1998.

Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Albuquerque, for Plaintiff-Appellee.

William J. Friedman, Albuquerque, for Defendant-Appellant.

Herb Yazzie, Attorney General, Judith A. Leaming, The Navajo Nation Dep't of Justice, Window Rock, Navajo Nation, AZ, Amicus Curiae for The Navajo Nation.

Barbara E. Bergman, Chair, Amicus Curiae Committee, Albuquerque, Amicus Curiae for the New Mexico Criminal Defense Lawyers Association.

## OPINION

FLORES, Judge.

1. Defendant appeals his convictions for driving while intoxicated (DWI) (second offense), reckless driving, great bodily injury by vehicle (alternatively by reckless driving or DWI), and four counts of vehicular homicide (alternatively by reckless driving or DWI). Defendant raises numerous issues on appeal. The primary focus of Defendant's appeal concerns the district court's decision to grant the State's second change of venue motion in this case. Defendant contends that the district court erred in deciding to change venue from Taos County. Defendant also contends that the district court violated Defendant's federal and state constitutional rights by deciding to change venue to Doña Ana County. Because we determine that the district court's decision to change venue from Taos County must be reversed, we do not reach the merits of Defendant's constitutional challenges to the district court's selection of Doña Ana County as the new venue for the third trial.

2. However, we will consider a number of other issues raised by Defendant because they have the potential of affording Defendant greater relief on appeal or because they will likely recur at a new trial. In particu-

lar, we also address Defendant's challenges to the district court's decisions to (1) deny Defendant's motion to dismiss; (2) admit Defendant's blood alcohol test results into evidence; and (3) enhance Defendant's sentences based on a prior misdemeanor DWI conviction. For the reasons that follow, we affirm Defendant's conviction for DWI from the first trial in this case. With regard to the remainder of Defendant's convictions following the third trial, we reverse and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

3. This case arises from a devastating and tragic automobile accident that occurred on Christmas Eve, 1992. Defendant was traveling in the wrong direction on Interstate 40 when he collided head-on with another automobile. The driver of the other vehicle was seriously injured, and the other four passengers, a mother and her three young daughters, were all killed. Defendant admitted to drinking seven and one-half beers earlier in the evening before the accident. However, Defendant maintained that shortly after he began to drive home he became disoriented because of a migraine headache and inadvertently turned on Interstate 40 going the wrong way.

4. Defendant was ultimately bound over for trial in Bernalillo County on one count of driving while intoxicated (DWI), one count of reckless driving, one count of great bodily injury by vehicle (alternatively by reckless driving or DWI), and four counts of vehicular homicide (alternatively by reckless driving or DWI). Because of the widespread publicity surrounding the incident, Defendant moved for a change of venue to Taos County. Thereafter District Judge Frank H. Allen, Jr., with the concurrence of the State, granted Defendant's motion. The first trial began in Taos County in June 1994, with Judge Frank H. Allen, Jr., presiding. Following Defendant's first trial in Taos County, the jury convicted Defendant of DWI. However, the jury deadlocked on the more serious charges of homicide by vehicle and great bodily injury by vehicle, voting 9 to 3 in favor of conviction. Following the first mistrial,

the State moved for a change of venue because of the publicity attending the mistrial. Judge Allen denied the State's motion for change of venue.

5. Judge Allen subsequently recused from the case, and District Judge Richard Blackhurst was assigned to preside over the second trial in Taos County. Before the second trial, the State renewed its motion for change of venue, which Judge Blackhurst also denied. Defendant was retried in November 1994, but a Taos County jury again deadlocked 9 to 3 in favor of conviction. Judge Blackhurst declared a mistrial and shortly thereafter he also recused from the case. The case was then reassigned to District Judge James F. Blackmer.

6. After the case was reassigned to Judge Blackmer, the State again moved for a change of venue. Following a hearing on the matter, and over Defendant's objection, Judge Blackmer decided to grant the State's motion to change venue from Taos County. Judge Blackmer held another hearing to consider alternative counties to which venue could be changed. Again over Defendant's objection, Judge Blackmer decided to change venue to Doña Ana County. Following Defendant's third trial in May 1995, the Doña Ana County jury convicted Defendant on all counts. Judge Blackmer ultimately sentenced Defendant to a total of twenty-five years, with three years of the sentence suspended, and Defendant appealed.

## II. CHANGE OF VENUE

7. The district court's change of venue order noted that the court had the discretion to order a second change of venue under NMSA 1978, Section 38–3–6 (1953). The district court also noted that it was changing venue pursuant to NMSA 1978, Section 38–3–3(A)(2)(c) (1965), because an impartial jury could not be selected in Taos County due to public excitement and local prejudice. We agree with the district court that a second change of venue is discretionary. However, the court's discretion should be guided by its obligation to ensure that the parties receive a fair trial from an unbiased, impartial jury. *See generally State v. Woods,* 92 W.Va. 331, 115 S.E. 470 (1922); 21 Am.Jur.2d *Criminal*

Law § 375 (1981). We also note that the fact that venue has already been changed once can weigh against a second change of venue. *See People v. Gallego,* 52 Cal.3d 115, 276 Cal.Rptr. 679, 703, 802 P.2d 169, 193 (1990) (en banc) (recognizing that when considering request for second change of venue the reputations and standing of the victims and defendant in the local community are less likely to prevent a fair trial); *see also People v. Cooper,* 53 Cal.3d 771, 281 Cal.Rptr. 90, 108, 809 P.2d 865, 883 (1991) (en banc) (applying *Gallego* ).

8. Defendant raises a number of questions concerning the district court's decision to change venue from Taos County. His primary focus on appeal is the district court's decision to change venue without first trying to select a third jury from Taos County through the use of voir dire. In response, the State maintains that the district court is not required to attempt jury selection before deciding to change venue. The State further asserts that under the circumstances of this case the district court did not abuse its discretion by changing venue from Taos County.

9. The district court's extensive and thoughtful explanation reveals a number of reasons why the court believed that a change of venue from Taos County was necessary. Permeating the district court's entire decision was a concern about the effect of the extensive pretrial publicity in this case. Because of the amount of pretrial publicity, the district court also appeared concerned about the impact of that publicity in Taos County, which Judge Blackmer characterized as a small, close-knit community. In addition, the court expressed reservations about the effect of comments in the press made by the prosecutors, defense counsel, Defendant, and Defendant's family. Also listed as a basis for the district court's ruling was a concern about comments made by a former Taos state senator, and a current Taos state senator, that were critical of the prosecution. The district court's decision to change venue was also affected by the belief that there was undisclosed bias among jurors in the second trial. And finally, the court worried about the effect that two hung juries would have on a third jury from Taos County.

10. At the outset, we note Defendant's contention that this Court should use a heightened standard of review to examine the district court's change of venue decision. Defendant cites a number of out-of-state authorities and commentaries to support the use of a more rigorous standard of review on appeal. However, a long line of cases in New Mexico establish that the district court's decision on a motion for change of venue is reviewed for an abuse of discretion. *See, e.g., State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991); *State v. Hargrove,* 108 N.M. 233, 239, 771 P.2d 166, 172 (1989); *State v. Fernandez,* 56 N.M. 689, 692, 248 P.2d 679, 681 (1952); *see also McCauley v. Ray,* 80 N.M. 171, 174–76, 453 P.2d 192, 195–97 (1968) (in determining whether substantial evidence supports a venue decision, the appellate court considers the effects of media coverage, crowds, and witnesses' testimony concerning undue influence on the judicial process). Although there may be authority for a more demanding standard of review in other jurisdictions, this Court is bound by our Supreme Court's numerous decisions that apply an abuse of discretion standard. *See Alexander v. Delgado,* 84 N.M. 717, 718, 507 P.2d 778, 779 (1973) (Supreme Court precedent controls).

11. Defendant suggests that the trend in New Mexico is toward a heightened, de novo review when substantial rights of constitutional dimension are involved in criminal cases. *See, e.g., State v. Attaway,* 117 N.M. 141, 145–46, 870 P.2d 103, 107–08 (1994); *State v. Werner,* 117 N.M. 315, 316–17, 871 P.2d 971, 972–73 (1994); *Aguilar v. State,* 106 N.M. 798, 799, 751 P.2d 178, 179 (1988); *State v. Juarez,* 120 N.M. 499, 502, 903 P.2d 241, 244 (Ct.App.); *State v. Graves,* 119 N.M. 89, 91, 888 P.2d 971, 973 (Ct.App.1994). However, none of the cases cited by Defendant involve situations where this Court or our Supreme Court considered reexamining the abuse of discretion standard. Moreover, we are not persuaded that the circumstances of this case warrant a departure from New Mexico's long-standing reliance on the abuse of discretion standard to resolve venue issues on appeal.

12. We decline Defendant's invitation to impose a heightened level of scrutiny, and we remain committed to applying New Mexico's well-settled abuse of discretion standard in this case. In doing so, we cannot simply substitute our judgment for that of the district court, but we must ensure that the district court correctly applied the legal standard for changing venue. Similarly, we may not reweigh the evidence on appeal, but we must carefully review the record to determine whether there is substantial evidence to support the district court's decision. With that framework in mind, we proceed to consider whether the district court abused its discretion when it changed venue from Taos County.

13. Both sides agree that the extensive pretrial publicity in this case played a key role in the district court's decision to change venue. Indeed, our change of venue statute recognizes that pretrial publicity may warrant a change of venue. *See* Section 38–3–3(A)(2)(c). However, our change of venue statute also makes it clear that pretrial publicity will only warrant a change of venue when public excitement and local prejudice have risen to the level that an impartial jury cannot be selected in the county to try the case. *Id.* Similarly, New Mexico case law demonstrates that pretrial publicity alone will not warrant a change of venue. "Exposure of venire members to publicity about a case by itself does not establish prejudice or create a presumption of prejudice." *Chamberlain*, 112 N.M. at 726, 819 P.2d at 676; *see also State v. McGuire*, 110 N.M. 304, 311, 795 P.2d 996, 1003 (1990).

14. Defendant maintains that the only way the district court could determine whether an impartial jury could be selected in Taos County was to actually attempt to select a jury with the benefit of voir dire. The State suggests that voir dire is not required before the district court may decide to change venue. Also, the State maintains that, under the circumstances of this case, the district court did not abuse its discretion in concluding that a fair and impartial jury could not be selected from Taos County.

15. Defendant correctly points out that pretrial publicity rarely raises a presumption of prejudice. *See, e.g., Chamberlain*, 112 N.M. at 726, 819 P.2d at 676; *McCauley*, 80 N.M. at 175, 453 P.2d at 196. Defendant is also correct in suggesting that many cases advocate the use of voir dire as the preferred method of determining whether pretrial publicity has made it impossible to select a fair and impartial jury. *See, e.g., Chamberlain*, 112 N.M. at 726, 819 P.2d at 676; *McGuire*, 110 N.M. at 311, 795 P.2d at 1003; *Hargrove*, 108 N.M. at 239, 771 P.2d at 172. However, we do not advocate a rigid rule that always requires the district court to conduct voir dire before deciding to change venue. Indeed, Defendant recognizes that there are situations when the district court may change venue without the benefit of voir dire because of a presumption of prejudice. Defendant simply argues that the extreme circumstances that are necessary for such an approach are not present in this case. We agree.

16. One of the leading cases cited by Defendant, *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is also recognized by Professors LaFave and Israel as establishing that there can be extreme situations in which "the pretrial publicity is so pervasive that it is not curable by the most careful voir dire, so that a change of venue is a necessary remedy." *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 22.2(a), at 764 (1984). At the same time, however, LaFave and Israel have observed that "it remains common practice after *Rideau* for trial courts to refuse to rule on a request for a change of venue until after an attempt has been made to select an impartial jury[.]" *Id.* The question is, therefore, whether this case presents those rare and extreme circumstances raising a presumption of prejudice that would warrant a change of venue without exploring the possibility of selecting a jury with the benefit of voir dire.

17. We note that the dissent views our references to *Rideau* as the use of a "two-step test" that should not be employed in this case. We do not view our decision in those terms, nor do we believe that the result in this case is controlled by the acceptance or rejection of any such test. Our Supreme Court has interpreted *Rideau* to stand for

the proposition that "there may be a denial of due process because of publicity even though no direct showing of prejudice is made." *State v. Chavez*, 78 N.M. 446, 448, 432 P.2d 411, 413 (1967). But as we discuss below, the pretrial publicity in this case simply did not establish that a fair trial could not be had in Taos County.

18. Without a doubt the pretrial publicity in this case was extreme. Indeed, neither side escaped the publicity generated by this case. As a consequence of this publicity, the State sought a second change of venue arguing that the pretrial publicity in the case prevented either side from obtaining a fair and impartial jury. In fact, the district court decided to change venue from Taos County in the belief that neither Defendant, nor the State, could receive an unbiased, impartial jury. As a result, this Court must determine whether the pretrial publicity in this case raised a presumption of prejudice against the State, or Defendant, or both. However, we must also keep in mind that it was the State seeking a change of venue, and it was doing so over Defendant's strenuous objection.

19. Many years ago, the New Mexico Supreme Court declared that the state could move for a change of venue on its own behalf. *See State v. Holloway*, 19 N.M. 528, 546–47, 146 P. 1066, 1071–72 (1914). However, our Supreme Court cautioned that a change of venue on behalf of the state should only be done with great care and deliberation. *Id.* at 546, 146 P. at 1071. Moreover, our Supreme Court proclaimed that a change of venue motion by the state should only be granted when the state shows that public sentiment is such as to render improbable a fair and impartial trial. *Id.*

20. Thirteen years later, our Supreme Court expanded the state's right to move for a change of venue, holding that the state may successfully move for a change of venue over the defendant's objection when there is such bias and prejudice against the defendant that he or she cannot receive a fair trial. *See State v. Archer*, 32 N.M. 319, 255 P. 396 (1927). The Court reasoned that the state has the duty to move for a change of venue to protect the defendant from his or her own

ignorance and mistake. *Id.* at 323, 255 P. at 398.

21. From *Holloway* and *Archer*, we perceive three basic lessons. First, the state may move for a change of venue to protect its own right, and the defendant's right, to a fair trial. Second, when the state does elect to move for a change of venue it carries a heavy burden to show that public sentiment is such that a fair and impartial trial is improbable. We describe the state's burden as heavy because-its duty to the defendant differs from attorneys' obligations in a civil case. *See Archer*, 32 N.M. at 323, 255 P. at 398. In a civil case, parties must protect their own interests against their adversaries. *Id.* In a criminal case, however, the state owes a duty to the defendant to insure that the defendant receives a fair trial. *Id.* Further, the court should guard against an abuse of the state's power when the state moves for a change of venue. *See Holloway*, 19 N.M. at 546, 146 P. at 1071. We believe this is particularly true when the state purports to change venue for the defendant's benefit, but over the repeated objections of the defendant and his attorney. Third, the state must move for a change of venue for the benefit of the defendant, even over the defendant's objection, when it is necessary to protect the defendant from his or her own mistake and ignorance.

22. Thus, in this case, to the extent that the State sought a change of venue for Defendant's benefit and over Defendant's objection, we question whether it was entitled to do so in light of *Archer*. The district court did rely to some extent on statements that defense counsel made in the press following the first mistrial suggesting that pretrial publicity had permeated Taos County and that both sides would have to rethink venue. Nevertheless, it is clear from the record that by the time the second mistrial occurred, Defendant was adamantly.... opposed to the State's efforts to change venue from Taos County. The State cannot seriously contend that Defendant's objection to a change of venue from Taos County was the product of mistake or ignorance. Indeed, the district court commended defense counsel for his very well-argued position on the question of

venue. For purposes of this appeal, however, we assume without deciding that the State was entitled to rely on whatever prejudice there was against Defendant and the State to support its motion to change venue.

23. Nevertheless, we remain convinced that the State was still required to show that public sentiment in Taos County had risen to such a level that a fair and impartial jury for the State or Defendant was improbable. *Holloway*, 19 N.M. at 546–47, 146 P. at 1071–72; *Archer*, 32 N.M. at 323, 255 P. at 398. Further, because the district court did not attempt to select a third jury from Taos County before deciding to change venue to Doña Ana County, the State must shoulder the additional burden of showing that the pretrial publicity in the case was of the rare and extreme character justifying a presumption of prejudice against Defendant and the State.

24. The dissent suggests that Defendant has less of an interest in the venue of this case because he originally moved for a change of venue from Bernalillo County. However, our decision is not based on the assumption that Defendant has a right to be tried in Taos County. Since both Defendant and the State stipulated to the first change of venue to Taos County, we believe both sides committed themselves to resolving this matter in Taos County unless a fair and impartial jury could not be impaneled from Taos County. Although the district court has discretion to change venue a second time, we do not believe that discretion is unfettered. To the contrary, under the unique procedural circumstances of this case, the district court could only exercise its discretion to change venue if the record demonstrated that a fair and impartial jury from Taos County was improbable.

25. Apparently aware of the extreme circumstances that needed to exist before the State's change of venue motion could be granted without first attempting jury selection, the district court was careful in its attempt to consider all of the information before it that may have been pertinent to the question of venue. And as we outlined above, the district court was able to articulate a number of factors it considered before

deciding to change venue from Taos County. However, after carefully reviewing the extensive record in this case and considering each of the factors relied upon by the district court, individually and as a whole, we do not believe the record supports the district court's decision to take the drastic step of changing venue without first attempting to select a new jury from Taos County.

26. A major factor in the district court's decision to change venue was the amount of pretrial publicity in this case. It is self-evident to anyone who has lived in New Mexico the past few years that this case has received an enormous amount of publicity. The record is replete with exhibits and testimony concerning the pretrial publicity in this case. What the record does not contain, however, is a clear showing by the State that the pretrial publicity created such an insurmountable amount of bias and prejudice against the parties that it was improbable that a fair and impartial jury could be selected from Taos County.

27. For both of its change of venue motions, the State relied heavily on the testimony and public polling report of Brian Sanderoff, the president of Research & Polling, Inc. Mr. Sanderoff was recognized as an expert in survey research and demographic analysis. The survey report generated by Mr. Sanderoff's firm for this case reveals that it was designed to measure awareness levels and public opinion concerning this case. The final conclusions from the survey were that awareness of Defendant and the events surrounding the accident and first trial were higher in Taos County than in Doña Ana County, primarily because Taos County receives its news primarily from the Albuquerque media market while Doña Ana County is also informed by the El Paso media market.

28. Mr. Sanderoff also testified to some of the conclusions he drew from the survey. In Taos County, 88% of the respondents knew who Defendant was or knew something about the event he was involved in. Mr. Sanderoff also noted that about 60% of the respondents from Taos County gave an opinion of guilt or innocence (55% guilty or probably guilty and 5% not guilty or probably not guilty). Mr. Sanderoff was of the opinion

that the high level of awareness in Taos County could impact on the district court's ability to impanel an impartial jury, and that there would be a better chance of getting a fair and impartial trial in Doña Ana County.

29. Mr. Sanderoff did acknowledge that of the people surveyed who had formulated an opinion about the case, more of them formulated a guilty opinion in Doña Ana County than in Taos County (67% vs. 62%). Mr. Sanderoff was of the opinion that Taos County was not "the best county to have a fair and impartial jury impaneled for this case for the State or for the Defendant." Mr. Sanderoff also testified that he believed public awareness levels are relevant because "with awareness oftentimes comes formulation of opinion. Sometimes, sometimes not."

30. In light of the public awareness and public opinion evidence supplied by Mr. Sanderoff, the district court was understandably concerned about the effect of the pretrial publicity in this case. And indeed, the polling data also suggested that a majority of the people in Taos County may have been biased against Defendant. Nonetheless, we must keep in mind that Defendant vigorously opposed the State's efforts to obtain a change of venue for Defendant's benefit. And because the State must demonstrate such a high degree of prejudice against Defendant before it can successfully move to change venue for Defendant's benefit and against his wishes, see Holloway, 19 N.M. at 546–47, 146 P. at 1071–72 and Archer, 32 N.M. at 323, 255 P. at 398, we believe the record fails to demonstrate the overwhelming bias against Defendant that is necessary before a change of venue can be granted for Defendant's benefit over his objection.

31. We are even more certain that the general pretrial publicity generated by this case did not raise a presumption of prejudice against the State. As we outlined above, the State was still faced with a heavy burden even if its motion to change venue was concerned only with the State's right to a fair and impartial jury. See Holloway, 19 N.M. at 546–47, 146 P. at 1071–72. However, despite undoubted negative pretrial publicity that existed against the State, the State's own polling evidence demonstrated that only

5% of the Taos County respondents in the poll had preconceived opinions in favor of Defendant and against the State. We simply do not believe that such a slim showing of bias against the State supports the district court's decision to change venue without at least first attempting to select another Taos County jury.

32. Even if we disregard the polling evidence in this case, we still do not believe that the character of the pretrial publicity in this case raises a presumption of prejudice that would warrant a change of venue without an attempted jury selection. To the extent that the pretrial publicity in this case was inflammatory and prejudicial, most of it was directed against Defendant. And in the estimation of Defendant and his capable counsel, the pretrial publicity in the case did not cause them to believe that a change of venue from Taos County was necessary. Neither the State nor the district court ever suggested that Defendant and his counsel were opposing the change of venue out of ignorance or mistake. See Archer, 32 N.M. at 323, 255 P. at 398. And since Defendant was adamantly opposed to a change of venue, we do not believe it was appropriate for the district court to order a change of venue with the implication that, at least in part, it was for Defendant's own good. See Susan Bandes, Taking Some Rights Too Seriously: The State's Right to a Fair Trial, 60 S.Cal.L.Rev. 1019, 1042 (1987) ("[A]ssuming a competent defendant with competent counsel, it is safe to assume that an interest asserted by the state and opposed by the defendant is not in the defendant's interest.") (footnote omitted).

33. We realize, however, that the district court was also concerned about the effect of the pretrial publicity against the State. Although much of the pretrial publicity was directed against Defendant, there was a significant amount of negative publicity directed against the State. In particular, numerous comments were made in the press raising allegations of racism against the prosecution, and expressing resentment against the prosecution for comments the prosecution made criticizing jurors from Taos County who voted to acquit Defendant in the previous trials. In fact, the State became concerned enough

about the negative comments being made in the media that it moved for a gag order shortly after the second mistrial was declared.

34. The State argued that comments defense counsel was making in the media prior to the third trial that were critical of the prosecution were improper, would make it impossible for the State to receive a fair trial, and required the district court to issue a gag order. In particular, the State pointed to an Op–Ed article defense counsel wrote for the *Albuquerque Journal*, as well as a couple of appearances defense counsel made on local talk shows. In response, defense counsel contended that his remarks were simply in response to improper comments made by the district attorney in the media and were also intended to counteract all the negative and inaccurate information that was being circulated in the press. To substantiate his position, defense counsel submitted a collection of over 200 newspaper articles to show the negative publicity against Defendant. In addition, defense counsel also submitted a video tape containing numerous television news reports of this case. Finally, defense counsel submitted a complaint he filed with the state disciplinary board against the district attorney as evidence of his claim that the district attorney was making untrue and inflammatory comments in the press to prejudice Defendant's right to a fair trial.

35. The district court ultimately granted the State's motion for a gag order and the decision was reversed by our Supreme Court pursuant to a writ of superintending control. *See Twohig v. Blackmer*, 1996 NMSC 023, 121 N.M. 746, 918 P.2d 332. In *Twohig*, our Supreme Court recounted the history of this case as it unfolded in the media. *Twohig*, 1996 NMSC 023, ¶¶ 3–9, 121 N.M. 746, 918 P.2d 332 (summary of public comments and accusations between prosecution and defense). But even though our Supreme Court characterized the publicity in this case as unprecedented, the Court concluded that there was a complete lack of factual findings to support the conclusion that the parties' right to a fair trial was endangered by attorney comments in the press. *Twohig*, 1996 NMSC 023, ¶ 28, 121 N.M. 746, 918 P.2d 332.

We believe that the same lack of factual foundation that was fatal in *Twohig* exists in this case, particularly since our Supreme Court noted that the inquiry is the same whether the Court is called upon to analyze the constitutionality of a gag order or determine whether pretrial publicity has deprived the defendant of a fair trial. *Twohig*, 1996 NMSC 023, ¶ 16, 121 N.M. 746, 918 P.2d 332.

36. However, because *Twohig* approached the case from the perspective of defense counsel's and Defendant's right to free speech, the opinion does not fully resolve whether the negative publicity directed against the State rose to such a level that the State would be unable to receive a fair trial in Taos County. The district court was apparently concerned about the negative publicity against the State that occurred in response to statements made by the district attorney criticizing Taos jurors who voted to acquit. However, to the extent that negative publicity against the State occurred in response to comments made by the district attorney in the press, the State may not rely on such pretrial publicity to support its motion for change of venue. *See United States v. Bakker*, 925 F.2d 728, 733 (4th Cir.1991) (party moving for a change of venue may not rely on pretrial publicity that the movant caused).

37. The district court also specifically referred to comments made by former and current Taos state senators to support its conclusion that a fair trial was not possible in Taos County. The first item referred to by the court was a letter to the editor of the *Taos News* purportedly written by Francisco "El Comanche" Gonzales, a former state senator from Taos. The letter generally accuses former District Attorney Robert Schwartz and others of prosecuting Defendant with racist motives. The second item referred to by the court concerns an article from the *Albuquerque Journal* in which the current state senator from Taos, Carlos Cisneros, criticized then District Attorney Schwartz during a budget hearing for continuing to prosecute Defendant despite two hung juries in Taos.

38. To the extent that both local leaders were critical of the prosecution, there was no

showing in the record that their beliefs were widespread within the Taos community. In fact, the district court itself recognized that it could not determine whether the thoughts, comments, and criticisms contained in Francisco Gonzales's letter to the editor reflected similar or widespread thoughts and opinions held by other Taos County residents. However, the district court did believe that the thoughts and opinions of both local leaders would reinforce and solidify similar thoughts and opinions that may have been held by other Taos County residents. The district court also presumed that as local leaders Francisco Gonzales and Senator Cisneros were aware of, and speaking on behalf of, their Taos County constituency.

39. Because Judge Blackmer was concerned about the effect of these comments within the Taos County community, he took note of his prior experiences presiding over trials and hearings in Taos County. *Cf. People v. Rich*, 237 Mich. 481, 212 N.W. 105, 106 (1927) (trial judge may rely on judicial knowledge acquired from first trial in determining to grant state's motion for change of venue following mistrial). Judge Blackmer reflected on his "FINE experiences with Taos county jury selections and juries," and he noted "that Taos area citizens/jurors are close-knit, know and socialize with each other well, exchange news and information and points of view openly and freely, and have a great deal of personal respect and consideration for each other and their opinions and points of view."

40. While we can appreciate the district court's concern over the effect that publicity and local commentary about the case might have on the small, close-knit community of Taos County, Judge Blackmer's judicial experiences in Taos County seem to contradict his decision to change venue without attempting to select a jury first. The fact that Taos county citizens "have a great deal of personal respect and consideration for each other and their opinions and points of view" suggests that potential Taos County jurors would be well-suited and committed to serving as fair and impartial jurors who could competently assess the evidence presented in court. Indeed, Judge Blackmer's experi-

ences with Taos County residents clash with the image of a community in which a fair and impartial jury could not be empaneled.

41. We do not mean to imply that the district court's apprehensions about holding a third trial in Taos County are unimportant. However, nothing in the record supports the notion that the court, with the able assistance of counsel on both sides, would be unable to ferret out potential prejudice through the use of a thoughtful and probing jury selection process. *See Twohig*, 1996 NMSC 023, ¶ 27, 121 N.M. 746, 918 P.2d 332 (commenting on how the district court and attorneys used extensive voir dire to combat potential prejudice caused by pretrial publicity, and noting that extensive voir dire was also available for use in the third trial). Before the district court took the unenviable step of declaring a community incapable of rendering a fair and impartial verdict, the court should have exhausted all legitimate means of securing a fair and impartial jury in Taos County. *See* John A. Burgess, Note, *The Efficacy of a Change of Venue in Protecting a Defendant's Right to an Impartial Jury*, 42 Notre Dame Law. 925, 942 (1966–67) (A change of venue "amounts to an admission that justice cannot be done in the forum in which the motion is made, which is a severe blow to people who pride themselves in their ability to be fair to their fellows.").

42. Although we believe it is vitally important that the district court make an attempt to select a new jury from Taos County before ordering a change of venue, we realize that voir dire can prove to be an ineffective means of exposing bias and prejudice within a jury venire. *See* LaFave & Israel, *supra*, § 22.2(d), at 766 ("there is reason to question" whether voir dire will be an effective remedy to expose all instances of bias caused by pretrial publicity); *see also* Alfred Friendly & Ronald L. Goldfarb, *Crime and Publicity* 103–04 (1967). In fact, there is authority in New Mexico demonstrating that voir dire may not always succeed in eliminating bias from a jury. *See State v. Shawan*, 77 N.M. 354, 358, 423 P.2d 39, 42 (1967) (trial court's denial of defendant's change of venue motion reversed despite fact that seated juror stated during voir dire that she thought she could

be fair because to expect jurors to confess bias is not always a reliable practice); *State v. Ball*, 34 N.M. 254, 280 P. 256 (1929) (change of venue following mistrial upheld where juror failed to disclose bias in favor of defendant).

43. The district court's belief that there was undisclosed bias in the prior juries in this case certainly suggests that the court was concerned that voir dire would be an ineffective barrier to bias and sympathy in a third Taos County jury. One of the primary factors influencing the district court's decision in this regard apparently came from comments Judge Blackhurst made following the second mistrial. Judge Blackhurst's comments were first alluded to by the State during the hearing on the State's second change of venue motion. The State indicated that Judge Blackhurst made comments to counsel for both sides after leaving the jury room indicating that the second jury did not want to talk to anyone but the judge, that the judge did talk with the second jury privately, and that afterward Judge Blackhurst commented to the attorneys that there were some jurors who did not disclose their biases. The State further indicated that Judge Blackhurst did not state whether the biases were against Defendant or the State, but that there was a clear indication that there was not a fair jury by the time they reached the end of their deliberations.

■ 44. Our review of the transcript has not revealed any recorded statement by Judge Blackhurst on this subject, only a notation in the transcript that Judge Blackhurst went to speak to the jury. Because the foregoing comments attributed to Judge Blackhurst are not of record, we do not believe they could form a proper basis for the district court's decision nor should they be considered now on appeal. *See State v. Martin*, 101 N.M. 595, 603, 686 P.2d 937, 945 (1984) (matters not of record cannot be reviewed on appeal).

45. Moreover, statements by Judge Blackhurst that are a part of the record on appeal do not reveal undisclosed bias within the second jury. In particular, Judge Blackhurst was quoted in the press as saying that the jury was "a very polarized group," that if

he "had a good knife, [he] could have cut the air in" the jury room, that the jury could not even agree on how to conduct deliberations, and that " '*at the minimum*' the problem could be described as personality clashes." Without engaging in improper speculation, Judge Blackhurst's comments can only be used to show that there was high tension and personality conflicts among the jurors in the second trial. Other post-trial interviews appearing in the press corroborate that emotions ran high; however, there was no indication that sympathy or prejudice affected deliberations. In fact, the jury foreman, who voted to convict, was quoted as saying that sympathy and prejudice did not enter into any of the deliberations.

46. We do note that there were some post-trial interviews with jurors from the first trial reporting statements of sympathy expressed by jurors in the first trial that apparently influenced their decision to vote to acquit. However, as we discussed above, there is no credible showing that improper bias and sympathy continued into the second jury. And without such a showing, the district court could only speculate that what had happened with the first jury would surely happen again.

■ 47. At this point we note some concern we have regarding the district court's decision to delve into the specifics of prior jury deliberations at all. "New Mexico has consistently held that it is improper to allow juror affidavits or other evidence tending to impeach, impugn or vitiate the jury's decisions." *State v. Castrillo*, 90 N.M. 608, 610, 566 P.2d 1146, 1148 (1977), *overruled on other grounds by State v. Wardlow*, 95 N.M. 585, 588, 624 P.2d 527, 530 (1981); *see also* Rule 11–606(B) NMRA 1997. Moreover, inquiry into jury deliberations where a mistrial has occurred is not allowed. *See Castrillo*, 90 N.M. at 610, 566 P.2d at 1148; *see also State v. Barela*, 91 N.M. 634, 639, 578 P.2d 335, 340 (Ct.App.1978) ("Inquiry as to a juror's inner reaction in arriving at a verdict is prohibited."). Further, "[i]nquiry into the truthfulness of a juror's response to questioning on voir dire is not precluded by Rule 11–606, although the truthfulness cannot be proved by the use of evidence barred by Rule

11–606." *Rios v. Danuser Mach. Co.*, 110 N.M. 87, 91, 792 P.2d 419, 423 (Ct.App.1990). For purposes of this appeal we need not decide whether the district court's inquiry into prior jury deliberations was appropriate because, as we discussed above, we do not believe the evidence of prior jury deliberations was sufficient to support the district court's unusual decision to forego voir dire.

48. We reiterate that we do not minimize the district court's concerns about whether an impartial jury can be empaneled in Taos County. However, there are a number of steps the district court can take to ensure that voir dire is as effective as possible in eliminating biased individuals from the jury. *See* 2 ABA *Standards for Criminal Justice* § 8–3.5, at 8.42–8.49 (2d ed. Supp.1986); *see also State v. Frank*, 92 N.M. 456, 458, 589 P.2d 1047, 1049 (1979) (recognizing that ABA Standards may be useful guidelines that the court may consider using). Before Taos County is declared incapable of rendering a fair and impartial verdict in this case, the district court must make every reasonable effort to select a jury from a community that the district court itself has deemed worthy of very high praise.

■ 49. Although it does not appear in the district court's written order changing venue, when ruling from the bench the district court commented at some length about its concerns over the effect that two prior mistrials in this case may have on a third jury from Taos County. *Cf. Ledbetter v. Webb*, 103 N.M. 597, 604, 711 P.2d 874, 881 (1985) (trial court's verbal comments can be used to clarify ruling). Defendant points out on appeal that the State seemed to rely heavily on the fact of two hung juries to argue that its right to a fair trial was compromised on the assumption that a fair and impartial jury includes a jury that will reach a decision. Although the district court rejected that argument, the court did rely on the fact of two hung juries. During its oral ruling, the court noted there has been widespread media coverage about the jury deliberations and the inability of two juries to reach a verdict. The court believed that it could be hard on future prospective jurors who know about the results of two hung juries, and who are aware of the hardships imposed on the two prior juries. Consequently, the court believed there was a risk that a future jury would decide to convict or acquit even if the jury was not unanimous simply to end the case. We find that line of reasoning troubling for several reasons.

50. To begin with, there is no support in the record for the district court's conclusion that a third jury from Taos County would simply reach a verdict regardless of their individual determinations of guilt or innocence. Such a conclusion amounted to improper speculation on the part of the court. Indeed, one could just as easily speculate that the same pressure to reach a verdict referred to by the district court could impact any potential jury from any county, not just Taos county. In addition, there is case law from other jurisdictions suggesting that the mere fact of prior mistrials is insufficient to support a change of venue unless it has become impossible to select more jurors for a new trial. *See Mast v. Superior Court*, 102 Ariz. 225, 427 P.2d 917 (1967) (en banc) (the grant of a change of venue motion filed by the state was reversed where there were two mistrials, defendant objected to change of venue, there was no evidence of bias against state, and evidence of bias against defendant); *see also Ashley v. State*, 72 Fla. 137, 72 So. 647 (1916) (per curiam) (where two prior mistrials declared and defendant objected to state's change of venue motion, district court erred in granting motion despite great difficulty in selecting another jury); *Rhoden v. State*, 179 So.2d 606 (Fla. Dist.Ct.App.1965) (mere fact that it would be difficult and time-consuming to select a jury is insufficient reason to change venue over defendant's objection). *But see People v. Peterson*, 93 Mich. 27, 52 N.W. 1039 (1892) (grant of state's change of venue motion upheld where jury was unable to agree on verdict in two previous trials).

51. In fact, the existence of two hung juries demonstrates that juries in Taos County have resisted the temptation to simply reach a verdict to end the case. Indeed, a post-trial interview with one of the jurors from the first trial supports the notion that jurors from Taos county would not agree to a

unanimous verdict simply to end the case. Following the first mistrial, one juror specifically recounted in the press how the jury put aside its desire to simply resolve the case when beginning to deliberate. Under the circumstances of this case, the simple fact of two hung juries cannot support the district court's decision to change venue from Taos County.

52. To summarize, under the unusual procedural posture of this case, the State was faced with a very heavy burden to satisfy before it could secure a change of venue from Taos County. In light of that heavy burden, we believe the district court's premature decision to change venue was plagued by a lack of support in the record to justify removal of this case from Taos County without first attempting to select a new jury from Taos County. The district court having failed to make the attempt, we hold that the court abused its discretion in granting the State's motion for a change of venue. Consequently, Defendant must receive a new trial. *See Rhoden*, 179 So.2d at 608 (defendant granted a new trial when trial court abused its discretion in granting state's motion for change of venue); *see also State v. Nichols*, 877 S.W.2d 722, 728 (Tenn.1994) (reversible error results if trial court abuses its discretion, or if the administration of justice is harmed, by using an unorthodox procedure to combat the prejudicial effects of pretrial publicity).

53. Because we have determined that this case must be remanded for a new trial, we do not address Defendant's constitutional challenges to the district court's decision to change venue to Doña Ana County. However, we recognize that even though the district court must attempt to seat a jury in Taos County the district court may still conclude during the jury selection process that a fair and impartial jury cannot be obtained in Taos County. In that event, the district court must necessarily reconsider alternate venues. Nothing in this opinion should be construed to suggest that Doña Ana County, or any other county, is or is not a proper alternate venue. At the same time, both sides will be free to advocate for any alternate venues they deem appropriate, and the district court should again devote its thoughtful and determined consideration to any constitutional arguments the parties may raise concerning alternative venues.

**III. OTHER ISSUES**

54. Although we are remanding for a new trial in light of our discussion on the change of venue issue, we also address the following issues because they either have the potential of affording Defendant greater relief on appeal or will necessarily recur on retrial.

**A. Motion To Dismiss**

55. Following the second mistrial, Defendant moved to dismiss the remaining charges on the grounds of prosecutorial misconduct, cruel and unusual punishment, and denial of due process. Defendant first points out that New Mexico does not have any case law on point, and he asks this Court to establish the standards to determine when dismissal is appropriate after multiple hung juries. However, Defendant does not specifically argue that the district court used inappropriate factors, and the State points out that the district court derived the factors it used from out-of-state cases cited by Defendant. *See State v. Abbati*, 99 N.J. 418, 493 A.2d 513 (1985); *State v. Witt*, 572 S.W.2d 913 (Tenn.1978). Under the circumstances, this Court will not reach out to decide whether the factors considered by the district court were correct when Defendant has failed to adequately raise such an issue. *See State v. Aragon*, 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) (issues must be adequately argued in brief). We simply assume, without deciding, that the district court considered the appropriate factors in reaching its decision to deny Defendant's motion to dismiss.

56. Defendant also proceeds on the assumption that, even if the district court used the right factors, it applied them incorrectly. Again, Defendant's arguments and citations to the record are inadequate. *See id.* Defendant does, however, refer to six of the eight factors considered by the district court as points of potential error which we will briefly address.

57. The first factor mentioned by Defendant concerns the number of prior mistrials and the outcome of jury deliberations. De-

fendant suggests that the district court incorrectly considered the fact of two nearly identical hung juries because the similar hung juries suggested that a similar result would occur on retrial. However, the district court also took into account the fact that 75% of each jury voted to convict. As such, the court reasonably believed that it was not highly unlikely that the State would succeed at a new trial. Defendant also argues the district court failed to consider the effect of the district attorney's improper comments on the outcome of the first two trials, but later Defendant argues that the district court considered the district attorney's conduct under the wrong factor, i.e., hardship on Defendant. Whether that is true, we are confident that the district court considered the district attorney's conduct in reaching its ultimate decision.

58. Defendant also argues that the district court's decision not to hold an evidentiary hearing was erroneous because the court's refusal to hear from former jurors was a critical loss since the district court had a negative view of the jurors. Even assuming the record would support Defendant's allegation that the district court had a negative view of the jurors, Defendant has not demonstrated how testimony from the jurors would have made a difference. *See State v. Hoxsie*, 101 N.M. 7, 10, 677 P.2d 620, 623 (1984) ("An assertion of prejudice is not a showing of prejudice."), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989).

59. The second factor referred to by Defendant concerns whether there was a likelihood of any substantial difference in a subsequent retrial. Defendant argues that the district court applied the second factor incorrectly by focusing on the likelihood of a substantial difference in the outcome of a third trial instead of a difference in evidence at a third trial. However, Defendant's argument is misleading because the district court's order clearly perceives the distinction and believes that the case law it was relying on would support its approach. In the absence of adequate argument and authority on this point from Defendant, *see Aragon*, 109

N.M. at 634, 788 P.2d at 934, we find no basis for reversal.

60. The third factor that Defendant mentions concerns the court's own evaluation of the relative strengths of each party's case. Defendant challenges the district court's very ability to consider the relative strengths and weaknesses of each party's case since it had yet to preside over a trial. We find the district court's decision to take judicial notice of the court record to make that decision reasonable and necessary, particularly where Defendant has not demonstrated how it would have made a difference if Judge Allen or Judge Blackhurst had evaluated this factor. *See Hoxsie*, 101 N.M. at 10, 677 P.2d at 623.

61. The fourth factor discussed by Defendant concerns the professional conduct and diligence of trial counsel. Defendant again argues that the district court failed to take into account the district attorney's conduct when weighing this factor. Assuming that is true, Defendant acknowledges that the district court did take District Attorney Schwartz's conduct into account in another factor. As such, this point does not establish reversible error because we are confident that the district court considered the district attorney's conduct in reaching its decision.

62. Defendant also touches upon two more factors concerning the prosecution's decision to pursue a third trial, and the hardship imposed on Defendant. The district court's order recites sufficient justification for its weighing of these factors. The fact that the district court is not focusing on the same information as Defendant does not amount to reversible error, particularly when Defendant has failed to adequately argue or cite to the record. *Aragon*, 109 N.M. at 634, 788 P.2d at 934. In sum, none of the cursory arguments raised by Defendant persuade us that the district court erred in denying Defendant's motion to dismiss.

## B. Blood–Alcohol Test Results

63. Defendant contends that this Court's recent opinion in *State v. Roper*, 1996 NMCA 073, 122 N.M. 126, 921 P.2d 322, requires suppression of the blood-alco-

hol test results obtained from his medical treatment records concerning his medical treatment shortly after the accident. *Roper* establishes that the blood test results are a privileged communication. *Roper*, 1996 NMCA 073, ¶¶ 8–13, 122 N.M. 126, 921 P.2d 322. The real issue is whether an exception under Rule 11–504(D)(3), NMRA 1997 existed because the privileged communication was relevant to Defendant's defense. Simply pleading not guilty does not raise a defense. *Roper*, 1996 NMCA 073, ¶ 15, 122 N.M. 126, 921 P.2d 322. However, Defendant did not simply plead not guilty and remain silent. Defendant aggressively pursued his migraine defense. Defendant argues that his blood-alcohol test results were not related to his defense of a migraine headache and should have been suppressed. However, we agree with the State that Defendant's blood-alcohol test results were relevant to his migraine defense. Consequently, Defendant waived the privilege set forth in *Roper* by raising his affirmative defense. Accordingly, we hold that the district court did not err in refusing to suppress the results of Defendant's blood-alcohol test taken shortly after the accident.

■ 64. Defendant also argues that the district court should have suppressed subsequent blood-alcohol test results obtained pursuant to a search warrant because the search warrant affidavit was inadequate. We are inclined to believe that the search warrant affidavit was adequate for the reasons discussed in this Court's previous opinion in *State v. House*, 1996 NMCA 052, ¶¶ 31–33, 121 N.M. 784, 918 P.2d 370. In any event, because we have already held that the district court did not err in admitting the results from the blood-alcohol test taken immediately after the accident, Defendant was not prejudiced by admission of the subsequent blood-alcohol test results. *State v. Wright*, 84 N.M. 3, 5, 498 P.2d 695, 697 (Ct.App.1972) (for error to be reversible it must be prejudicial).

**C. Enhancement of Defendant's Sentence Based on a Prior DWI conviction**

65. Defendant argues that his DWI sentence and his sentences for homicide by vehi-

cle and great bodily injury by vehicle were improperly enhanced based on an uncounseled, prior 1987 DWI conviction. Even if Defendant is not convicted at a new trial on the multiple counts for homicide by vehicle and great bodily injury by vehicle, this issue still remains relevant because we have determined that Defendant's DWI conviction is affirmable. Accordingly, we address the merits of Defendant's arguments.

■ 66. An uncounseled misdemeanor DWI conviction can be used for enhancement purposes if the court finds that the defendant entered a knowing, intelligent, and voluntary waiver of counsel. *See State v. Watchman*, 111 N.M. 727, 733, 809 P.2d 641, 647 (Ct.App.1991), *overruled in part on other grounds by State v. Hosteen*, 1996 NMCA 084, ¶ 21, 122 N.M. 228, 923 P.2d 595, *cert. granted*, 122 N.M. 227, 923 P.2d 594 (1996). We may not presume a valid waiver of counsel based on a silent record. *See State v. Vaughn*, 74 N.M. 365, 370–71, 393 P.2d 711, 714–15 (1964). However, " '[w]here there is some showing of affirmative waiver,' " the burden of proof rests on the defendant to prove that his or her waiver was not knowing, intelligent, and voluntary. *Bouldin v. Cox*, 76 N.M. 93, 98, 412 P.2d 392, 395 (1966) (quoting *Sandoval v. Tinsley*, 338 F.2d 48, 50 (10th Cir.1964)). The trial court then must determine whether the waiver of counsel is valid by examining the facts and circumstances of the case, including such factors as the complexity of the charges and the background, experience, and conduct of the accused. *See State v. Pino*, 1997 NMCA 001, ¶ 7, 122 N.M. 789, 932 P.2d 13.

■ 67. Although the waiver of counsel form that Defendant signed in 1987 does not create an irrebuttable presumption that Defendant's waiver of counsel was knowing, intelligent, and voluntary, we conclude that, under the circumstances of this case, the waiver form was sufficient to shift the burden onto Defendant to come forward and prove by a preponderance of the evidence that his waiver of counsel at the 1987 proceeding was not knowing, intelligent, and voluntary. *See State v. Gonzales*, 1997 NMSC 050, ¶ 15, 124 N.M. 171, 947 P.2d 128.

68. Although Defendant did present evidence to support his claim that his waiver of counsel was not knowing, intelligent, and voluntary, there was contradictory evidence to rebut Defendant's claim. Under the circumstances, we affirm the district court's decision that Defendant's waiver of counsel was knowing, intelligent, and voluntary. *See Gonzales,* 1997 NMSC 050, ¶ 17, 124 N.M. 171, 947 P.2d 128 (signed, written waivers of counsel are prima facie evidence to rebut defendant's contradictory allegations and trial court is free to disbelieve defendant's allegations); *see also State v. Thornton,* 1997 NMCA 108, ¶ 17, 124 N.M. 214, 947 P.2d 171.

69. Defendant also suggests that his guilty plea was not knowing, intelligent, and voluntary. Defendant relies on the recent case of *State v. Garcia,* 121 N.M. 544, 915 P.2d 300 (1996), to suggest that the record in this case is inadequate to support the district court's conclusion that his prior guilty plea was knowing, intelligent and voluntary. We agree that Garcia recognizes that the record must reflect that the defendant understands the consequences of his guilty plea. *Id.* at 547, 915 P.2d at 303. In this case, however, Defendant's specific challenge to the guilty plea is that the magistrate did not adequately explain that by pleading guilty to DWI he could later be subjected to enhanced sentences for future DWI-related offenses. However, a defendant need not be informed of all collateral consequences to pleading guilty to make the guilty plea knowing, intelligent, and voluntary. *See State v. Miranda,* 100 N.M. 690, 693, 675 P.2d 422, 425 (Ct.App.1983); *see also Nichols v. United States,* 511 U.S. 738, 748, 114 S.Ct. 1921, 1928, 128 L.Ed.2d 745 (1994) (there is no requirement that a misdemeanor defendant be advised that his conviction might be used for enhancement purposes if he is convicted of another crime in the future). In short, the district court did not err in concluding that Defendant's guilty plea was knowing, intelligent, and voluntary. Thus, the district court did not err in using Defendant's prior 1987 DWI conviction to enhance his sentence for the DWI conviction in this case.

## IV. CONCLUSION

70. Defendant's conviction for DWI after the first trial is affirmed. However, because we conclude that the district court should not have changed venue from Taos County, we reverse the remainder of Defendant's convictions after the third trial and remand for a new trial.

71. **IT IS SO ORDERED.**

APODACA, J., concurs.

ARMIJO, J., concurring in part, dissenting in part.

ARMIJO, Judge, concurring in part, dissenting in part.

72. I respectfully dissent because I believe the trial court's decision to grant a change of venue from Taos County was in accordance with law and amply supported by substantial evidence. In concluding that voir dire of a third venire in Taos County was a prerequisite to a change of venue, the majority attempts to eclipse all the other indicators of local prejudice and public excitement that were abundant in the record before the trial court. In doing so, the majority has stepped outside the permissible bounds of appellate review by independently weighing the evidence and substituting its own judgement for that of the trial court.

73. My discussion is limited to the issue of whether the trial court erred by moving Defendant's third trial from Taos County because of public excitement or local prejudice. My analysis of this issue focuses on the standard of appellate review, the necessity of conducting additional voir dire of prospective jurors, and the sufficiency of the evidence regarding local prejudice and public excitement in Taos County.

74. I concur in the affirmance of Defendant's conviction and sentence for driving while intoxicated (DWI). Although I disagree that a remand is required because of the change of venue from Taos County, I agree that the trial court did not err in denying Defendant's motion to dismiss, in admitting Defendant's blood-alcohol test results into evidence, and in enhancing Defendant's sentences based on a prior misde-

meanor DWI conviction. I do not address the merits of Defendant's constitutional challenges to the district court's selection of Dona Ana County as the new venue for the third trial because the majority bases it holding solely on the issue of the change of venue from Taos County.

## A. *Standard of Appellate Review*

75. In New Mexico, as in the majority of other states, "granting or denying a motion for a change of venue is within the sound discretion of the trial court," and an appellate court will not disturb the trial court's ruling absent an abuse of this discretion. *State v. Hernandez,* 115 N.M. 6, 21, 846 P.2d 312, 327 (1993); *see also* NMSA 1978, § 38–3–6 (1880) (second change of venue may be granted at court's discretion); 21 Am.Jur.2d *Criminal Law* §§ 389, at 643–44; 391, at 657–58 (1981) (appellate court will reverse trial court's venue ruling only where an abuse of discretion plainly appears). I agree with the majority that this is the standard of review to be applied in this case. I view the majority opinion as departing from the application of this standard and, instead, applying a higher level of scrutiny in which it independently weighs the evidence and substitutes its own judgment for that of the trial court. The application of such heightened scrutiny is inconsistent with an appellate court's limited role of determining whether the trial court abused its discretion.

76. One reason that appellate courts apply this deferential standard of review to change-of-venue issues is that "the question is largely one of fact and therefore one peculiarly within the province of the trial judge . . . ." 21 Am.Jur.2d *Criminal Law* § 391, at 659; *see also State v. Ferguson,* 111 N.M. 191, 193, 803 P.2d 676, 678 (Ct.App.1990) (matters are committed to trial court's discretion because trial court is thought to be in better position than appellate judges to decide them). "[T]he process of determining whether or not the facts necessary for a change of venue exist is the same as that followed in determining any other fact in a case." *McCauley v. Ray,* 80 N.M. 171, 174, 453 P.2d 192, 195 (1968) (citing *State v. Nabors,* 32 N.M. 453, 259 P. 616 (1927)). Thus,

when the trial court's factual findings regarding the grounds for a change of venue are reviewed on appeal, the question is whether there was substantial evidence to support those findings. *Id.* An appellate court does not reweigh the evidence.

## B. *Necessity of Voir Dire*

77. The majority faults the trial court for granting a change of venue without first conducting voir dire of prospective jurors during jury selection for a third trial in Taos County. I do not agree that voir dire is the only reliable evidence of "public excitement or local prejudice" under NMSA 1978, § 38–3–3(A)(2)(c) (1965). Moreover, I do not believe that a test which employs a rigid distinction between "actual" and "presumptive" prejudice provides the correct legal standard for evaluating such evidence in this case.

78. The majority derives its analysis of the standard of proof from *Rideau v. Louisiana,* 373 U.S. 723, 727, 83 S.Ct. 1417, 1420, 10 L.Ed.2d 663 (1963), a case in which the United States Supreme Court disregarded a trial court's factual findings in ruling that the denial of the defendant's motion to change venue violated the Due Process Clause. *Rideau* has been interpreted by some courts as establishing a two-step test for determining whether grounds for a change of venue based on pretrial publicity are present. *See, e.g., United States v. Bakker,* 925 F.2d 728, 732 (4th Cir.1991). Under this interpretation of *Rideau,* the question is whether the pretrial publicity, standing alone, is so prejudicial as to raise a presumption that prospective jurors have been affected by it, and if not, whether voir dire of prospective jurors reveals an actual prejudice among the jury pool that makes it impossible to empanel an impartial jury. *See id.*

79. The meaning and effect of *Rideau* are unclear and do not inexorably lead to this two-step test. *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 22.2(a), at 763–64 (1984); *ABA Standards for Criminal Justice: Fair Trial and Free Press* § 8–3.3 (3d ed. 1991) [hereinafter *1991 ABA Standards* ] (explicitly rejecting requirement of "actual prejudice" and requiring only "substantial likelihood of preju-

dice"); *People v. Williams,* 48 Cal.3d 1112, 259 Cal.Rptr. 473, 480, 774 P.2d 146, 153 (1989) (en banc) (requiring only "reasonable likelihood" of prejudice, which denotes lesser standard of proof than "more probable than not"). Since the trial court in *Rideau* did conduct voir dire in which the jurors who had been exposed to the pretrial publicity indicated that they had not formed fixed opinions about the defendant's guilt, *see Rideau,* 373 U.S. at 732, 83 S.Ct. at 1422 (Clark, J., dissenting), the holding in that case may be limited to instances of pretrial publicity that are so prejudicial that they entitle an appellate court to disregard contrary evidence elicited during voir dire and relied upon by the trial court. The Court is not asked to resort to such extreme measures in the present case.

80. Moreover, I find nothing in the record to suggest that the trial court employed a presumption of prejudice here, nor do I find any New Mexico authorities adopting the two-step test which the majority applies. On the contrary, our case law appears to reject both the proposition that exposure to pretrial publicity can be presumptively prejudicial in and of itself, *see State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991), and the proposition that a change of venue cannot be granted without a conclusive showing of actual prejudice. *See McCauley,* 80 N.M. at 175–76, 453 P.2d at 196–97 (quoting *State v. Alaniz,* 55 N.M. 312, 232 P.2d 982 (1951)); *cf.* II *ABA Standards on Criminal Justice* § 8–3.3 (2d ed. 1980) [hereinafter *1980 ABA Standards* ] (probability of prejudice is the issue; no showing of actual prejudice is required); *State v. Frank,* 92 N.M. 456, 458, 589 P.2d 1047, 1049 (1979) (recognizing that ABA Standards may provide useful guidelines for New Mexico courts). For these reasons, I would reject the standard of proof employed by the majority.

81. The majority suggests that the State must carry a particularly heavy burden of proof in this case because the State is the movant. I respectfully disagree. Our Supreme Court has repeatedly recognized that the State may move for a change of venue without violating a defendant's rights under Article II, Section 14 of the New Mexico Constitution or Section 38–3–3. *See State v. Lopez,* 84 N.M. 805, 807, 508 P.2d 1292, 1294 (1973); *State v. Archer,* 32 N.M. 319, 323, 255 P. 396, 398 (1927); *State v. Holloway,* 19 N.M. 528, 535, 146 P. 1066, 1067 (1914). New Mexico is not unique in allowing for a change of venue at the State's request. At common law, both the prosecution and the defense were permitted to obtain a change of venue. *See* 1 Joel Prentiss Bishop, *Bishop's New Criminal Procedure* §§ 69, 75a (2d ed.1913). Several of our sister states continue to recognize that the prosecution has an interest in the fair administration of justice which may outweigh a defendant's right to be tried in a particular location. *See 1991 ABA Standards, supra* § 8–3.3 (prosecution may move for change of venue because it has independent interest in obtaining a fair trial); 2 LaFave & Israel, *supra* § 22.2(a), at 765 (same).

82. Even in the states which recognize a defendant's absolute right to be tried in a particular venue, a defendant may waive that right by moving for, or consenting to, a change of venue, *see State v. Nichols,* 877 S.W.2d 722, 728 (Tenn.1994), or by objecting to a motion to return venue back to the county where the crime is alleged to have been committed after venue has been changed to another county. *See* 1 Bishop, *supra* § 73, at 55. New Mexico courts also recognize that a defendant may waive his right to be tried in the county where the crime is alleged to have been committed. *See Lopez,* 84 N.M. at 807–08, 508 P.2d at 1294–95.

83. In the present case, the alleged crimes were committed in Bernalillo County; hence Bernalillo County is the only venue in which Defendant has a right to be tried under Article II, Section 14 of the New Mexico Constitution. However, Defendant waived this right by successfully moving for a change of venue to Taos County and then objecting to the State's effort to move the third trial back to Bernalillo County. Once this right has been waived, it no longer provides any basis for imposing heightened scrutiny or a heavier burden of proof upon the State's motion for a change of venue. *Cf. Nichols,* 877 S.W.2d at 728 (where the defen-

dant waived his right to a particular venue by moving for a change of venue, appellate court would find no reversible error in trial court's venue decision absent showing that the defendant was prejudiced, the administration of justice harmed, or the trial court abused its discretion).

84. The majority further suggests that the State must bear a heavier burden of proof in this case because the first change of venue from Bernalillo County is a factor that weighs against the second change of venue from Taos County. However, the authorities upon which the majority relies to support this proposition only state that a prior change of venue "affects the analysis" of the factors the court is to consider in making its decision about a second change of venue. *See People v. Cooper*, 53 Cal.3d 771, 281 Cal.Rptr. 90, 107–08, 809 P.2d 865, 882–83 (1991) (en banc) (citing *People v. Gallego*, 52 Cal.3d 115, 276 Cal.Rptr. 679, 703, 802 P.2d 169, 193 (1990) (en banc)). Hence, I read these authorities as allowing for circumstances in which a prior change of venue weighs in favor of a second change of venue, not against it. I also note that under the California law that these authorities apply, it is entirely permissible to grant pretrial appellate review of a trial court's venue decisions before any voir dire has been conducted. *See Maine v. Superior Ct.*, 68 Cal.2d 375, 66 Cal.Rptr. 724, 726–27, 438 P.2d 372, 374–75 (1968).

85. In the present case, the first change of venue provided several factors that could weigh in favor of a second change of venue. First, since there was no evidentiary hearing on the first motion to change venue from Bernalillo County to Taos County, this prior change has no factual foundation upon which the trial court could rely in opposing a second change of venue. Second, the prior move to Taos County placed the trial in a smaller and more closely-knit community than either Bernalillo County or Dona Ana County. *See People v. Adcox*, 47 Cal.3d 207, 253 Cal.Rptr. 55, 66, 763 P.2d 906, 917 (1989) (en banc) (under some circumstances, court may infer that the smaller the community, the greater the chance of an unfair trial); Alfred Friendly & Ronald L. Goldfarb,

*Crime and Publicity* 79 n. 3 (1967) (impact of media coverage is less likely to dissipate over time in smaller community). Finally, because Defendant waived his constitutional right to be tried in Bernalillo County by moving for a change to Taos County, that right no longer carries any weight in the analysis of whether to grant a second change of venue.

86. Defendant's waiver of this right makes this case distinguishable from the authorities that the majority cites to support its imposition of a heavier burden of proof upon the State in this case. Those authorities are limited to situations in which a prosecutor's motion to change venue is an attempt to override a defendant's constitutional right to be tried in the venue where the crime was alleged to have been committed. *See Mast v. Superior Ct.*, 102 Ariz. 225, 427 P.2d 917 (1967) (en banc) (defendant objected to prosecutor's motion to change venue from county where crime was alleged to have been committed); *Ashley v. State*, 72 Fla. 137, 72 So. 647 (1916) (per curiam) (same); *Rhoden v. State*, 179 So.2d 606 (Fla.Dist.Ct.App.1965) (same). When the defendant has waived his or her constitutional right to be tried in a particular venue, as Defendant has done in the present case, this right no longer provides a basis for raising the standard of proof or requiring voir dire of prospective jurors.

87. Because there is no basis for requiring a heightened standard of proof in this case, I do not regard the presence or absence of voir dire of a third venire as the only determinative factor in deciding whether there were adequate grounds for a venue change, especially where the trial court had the benefit of a record replete with expert analysis of public opinion surveys, published statements of community sentiment, and voir dire conducted in prior mistrials. *See McCauley*, 80 N.M. at 175–76, 453 P.2d at 196–97; *1991 ABA Standards, supra* § 8–3.3. A change of venue is not simply a last-minute appendage to the jury selection process. *See* Note, *The Efficacy of a Change of Venue in Protecting a Defendant's Right to an Impartial Jury*, 42 Notre Dame Law. 925, 935 (1967).

88. While voir dire may prove useful in many cases, I would not impose a rigid requirement that trial courts must always conduct voir dire of prospective jurors before ruling on a motion to change venue. Such a requirement unnecessarily infringes upon the broad discretion that trial courts traditionally are afforded in determining the scope of voir dire and other areas of inquiry that indicate whether juror bias exists. *See Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991); *State v. Isiah,* 109 N.M. 21, 27–28, 781 P.2d 293, 299–300 (1989), *overruled on other grounds by State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). "[T]his primary reliance on the judgment of the trial court makes good sense [because] the judge of that court sits in a locale where the publicity is said to have had its effect and brings to his [or her] evaluation ... his [or her] own perception of the depth and extent of news stories that might influence a juror." *Mu'Min,* 500 U.S. at 427, 111 S.Ct. at 1906.

89. Imposing a rigid requirement of voir dire also places the party seeking a change of venue in "an unnecessarily awkward position":

> Unless he exhausts all his peremptory challenges he cannot claim on appeal, in the absence of a specific showing of prejudice, that the jury was not impartial. Yet, convinced that he must go to trial because his motion for a venue change was at first denied and in all likelihood will not ultimately prevail, he may fail to use every peremptory challenge sensing that the jurors he has examined may be comparatively less biased than others who might be seated were his peremptory challenges exhausted.

2 LaFave & Israel, *supra* § 22.2(a) (quoting *Maine,* 66 Cal.Rptr. at 727–28, 438 P.2d at 375–76). "It seems undesirable to use voir dire as the primary method of determining the character of the threat to trial fairness and at the same time make it the principal safeguard against such a threat if it exists." *1980 ABA Standards, supra* § 8–3.3; *see also 1991 ABA Standards, supra* § 8–3.3 (noting that it is administratively preferable to resolve change of venue motion at earliest possible stage of proceedings).

90. As the majority acknowledges, making voir dire such a determinative factor also is problematic because "to expect jurors to confess bias is not always a reliable practice." *State v. Shawan,* 77 N.M. 354, 358, 423 P.2d 39, 42 (1967); *cf. State v. Ball,* 34 N.M. 254, 280 P. 256 (1929) (affirming change of venue following mistrial in which juror failed to disclose bias in favor of defendant). In particular, the reliability of voir dire may be questioned where there is a lack of candor among prospective jurors, or where lawyers exploit voir dire as an appellate review in order to reach its conclusion that the trial court engaged in "improper speculation" with a "fatal" lack of factual foundation. I respectfully disagree with this conclusion and find no basis for the majority's departure. The record is replete with admissible evidence to support the trial court's detailed factual findings regarding local prejudice and public excitement in Taos County, and this evidence provides a basis for the trial court's ruling that is entirely independent of any speculation regarding jury deliberations or the constitutionally protected statements of counsel that were at issue in *Twohig v. Blackmer,* 1996 NMSC 023, 121 N.M. 746, 918 P.2d 332.[1]

96. The trial court properly took judicial notice of the admissible material in the record. *See DiMatteo v. County of Dona Ana,* 109 N.M. 374, 379, 785 P.2d 285, 290 (Ct.App. 1989) ("A district court is required to take

---

1. I reject the majority's attempt to draw parallels between the March 1995 change-of-venue order at issue in this appeal and the December 1994 gag order at issue in *Twohig.* While both orders may involve a similar factual inquiry into "the imminence and magnitude of the danger said to flow from [a] particular utterance," *Twohig,* 1996 NMSC 023, ¶ 16, 121 N.M. 746, 918 P.2d 332, the change-of-venue order is not a prior restraint on speech and to scrutinize it as such is contrary to the principle that "post-speech remedies are favored over prior restraints." *Id.* at 14. Unlike the gag order, the change-of-venue order is a discretionary ruling that was amply supported by detailed factual findings regarding the statutory criterion of local prejudice or public excitement. *See Ferguson,* 111 N.M. at 193, 803 P.2d at 678 (appellate court looks for sufficient indication in the record of reasons underlying trial court's discretionary ruling).

judicial notice of its prior proceedings in the same cause."); *cf. State v. Anaya,* 1997 NMSC 010, ¶ 13, 123 N.M. 14, 933 P.2d 223 (decided in 1996) (New Mexico Supreme Court may take judicial notice of record on file in court). The trial court was correct in considering its "own perception of the depth and extent of news stories that might influence a juror ...." *Mu'Min,* 500 U.S. at 427, 111 S.Ct. at 1906. The evidence of which the trial court took judicial notice is clearly delineated in the record. *See Frost v. Markham,* 86 N.M. 261, 263, 522 P.2d 808, 810 (1974).

97. The trial court correctly considered the expert opinion and public-opinion survey of Brian Sanderoff. The determination of whether to grant a change of venue "may be based upon such evidence as qualified public opinion surveys or opinion testimony offered by individuals ...." *1991 ABA Standards, supra* § 8-3.3; *see also Frank,* 92 N.M. at 458, 589 P.2d at 1049 (recognizing that ABA Standards may provide useful guidelines for New Mexico courts). The record indicates that Sanderoff was qualified and accepted as an expert in the following fields: public opinion polls, demographic analysis, redistricting, census data, and effects of media coverage.

98. With this information before it, the trial court considered a number of relevant factors and weighed these factors in favor of a change of venue from Taos County. *See Williams,* 259 Cal.Rptr. at 480, 774 P.2d at 153 (listing relevant factors); 21 Am.Jur.2d *Criminal Law* § 389 (same). Specifically, four of these factors warrant further discussion: (1) the nature and extent of pretrial publicity; (2) the nature and size of the Taos community; (3) political factors; and (4) the presence of fixed opinions.

### 1. *Nature and Extent of Publicity*

99. The events occurring on Christmas Eve 1992 and the ensuing prosecution of Defendant generated an extremely large volume of high-profile press coverage. As the majority acknowledges, the pretrial publicity was extreme. The trial court heard expert testimony that Taos County fell within the designated market area of the Albuquerque newspapers and television stations from which much of the publicity emanated, and that a high percentage of Taos residents were exposed to these sources on a regular basis. Taos residents were also exposed to radio broadcasts concerning the incidents which emanated from Albuquerque. The trial court reviewed over 200 newspaper articles and more than 40 television broadcasts, including a special television program devoted to this case, to reach its detailed findings regarding the nature and extent of pretrial publicity in Taos County.

100. The press coverage was unrelenting, continuing through the conclusion of the second trial with front-page newspaper articles and top-story television broadcasts. As noted in one newspaper article, "radio shows were abuzz with opinion about the hung jury...." "Public Expresses Dismay Over House Decision," *Albuquerque J.,* June 21, 1994, at A5. Another article in the June 23, 1994, edition of the *Taos News,* entitled "Highly publicized trial draws media circus; judge becomes ringmaster," observed that Defendant's "trial was moved to Taos from Albuquerque because of pretrial publicity. But the move did not stop the publicity." Hence, this is not a case where publicity was minimal or had diminished over time.

101. The trial court's review of the content of the newspaper articles and television broadcasts presented in the record revealed that the nature of the publicity was, in some instances, emotional, sensational, inflammatory, intrusive, and potentially misleading. As noted in the trial court's order, pictures of the accident scene were shown repeatedly in newspapers and on television. Both Defendant's family and the remaining family of the victims were depicted and interviewed by the media on a regular basis. Defendant was described as a "drunk Indian" and a "murderer." The prosecutors and victims' family members were accused of being "racists" and harboring a "lust for vengeance." Media coverage of the first and second trials included cameras in the courtroom, and probing interviews with members of the jury and the venire.

102. During voir dire of prospective jurors before the second trial, it became apparent that some of the media coverage had been misleading, as false impressions about

the facts of the case were traced to what prospective jurors had read or seen in the media. The State's polling expert also expressed a concern that people who had learned about the case through the media were quick to judge whether Defendant was guilty or innocent regardless of their knowledge of the evidence presented in the case.

103. The foregoing constituted sufficient evidence to support the trial court's findings regarding the nature and extent of the publicity.

### 2. Nature and Size of Community

104. Courts may consider the nature and size of the community as a factor in their venue decisions where they find it reasonable to infer that the impact of media coverage is less likely to dissipate over time in a smaller community or that the small size of the community increases the risk of an unfair trial for other reasons. See Adcox, 253 Cal.Rptr. at 66, 763 P.2d at 917; Maine, 66 Cal.Rptr. at 732, 438 P.2d at 380 (citing Friendly & Goldfarb, supra, at 79). In this case, the trial court's order changing venue from Taos County contains several findings regarding the nature and size of the Taos community.

105. The State's expert on demographics presented census data showing that Taos County had a population of 23,118, about 70 percent of which are adults. In comparison, Bernalillo County, where the offense was alleged to have been committed, had a population of about 500,000 people. Dona Ana County, where the third trial was held, had a population of 135,510. The size of the community at issue in the second change of venue is thus affected by the first change of venue, since Taos County has a significantly smaller number of individuals from which a jury pool may be selected than either Bernalillo or Dona Ana counties.

106. Voir dire of prospective jurors during the second trial gave some indication that information, opinions, and influence regarding the case were widely shared due to the close-knit nature of the Taos County community. At least one prospective juror in the second trial had attended the first trial. Several others had heard about the first trial from family, friends, neighbors, and co-workers. In addition, the trial court considered its own past experience with jury trials in Taos County in reaching its conclusions regarding the close-knit nature of the Taos community.

107. There was sufficient evidence in the record to support the trial court's findings regarding the nature and size of the Taos community.

### 3. Political Factors

108. "Political factors have no place in a criminal proceeding, and when they are likely to appear ... they constitute an independent reason for a venue change." Maine, 66 Cal. Rptr. at 732, 438 P.2d at 380. This principle can be traced to Sheppard v. Maxwell, 384 U.S. 333, 342, 354 n. 9, 86 S.Ct. 1507, 1512, 1518 n. 9, 16 L.Ed.2d 600 (1966), where the denial of the defendant's right to due process resulted, in part, from the fact that both the chief prosecutor and the trial judge were engaged in a "hotly contested election" that took place about two weeks after the trial began. Subsequent cases have expanded consideration of political factors beyond the context of elections involving officers of the court. In particular, courts have considered "political debate concerning the fiscal impact of the trial" as one factor supporting a change of venue. See People v. Tidwell, 3 Cal.3d 62, 89 Cal.Rptr. 44, 50, 473 P.2d 748, 754 (1970).

109. The offenses at issue in the present case occurred about one month prior to the start of a legislative session, and the victims' family members became the focus of efforts to reform the laws regarding drinking and driving during that session. While most of this legislative lobbying occurred outside of Taos County, it was widely reported by Albuquerque media sources which targeted Taos County as part of their designated market area.

110. The attention paid to this case by elected officials and local community leaders did not abate after the first or second mistrials occurred. Rather, the district attorney in charge of prosecuting the case was called before the legislature to answer questions concerning the fiscal impact of retrying the

case a third time. One of the individuals engaged in this questioning was a State Senator representing Taos County. *See* Colleen Heild, "Senators Grill DA on Gordon House Case," *Albuquerque J.*, Feb. 25, 1995, at A10. The State Senator was quoted in the press as "wondering if any of this (requested) funding [is] necessary to pursue the jury chasing to find a jury that will ultimately convict this gentleman[,]" and stating that "Taos juries have spoken twice but that he believes [District Attorney] Schwartz will try the case 10, 15 times until he gets what he wants." In addition, a local community leader and former state senator wrote and published a letter in the *Taos News* accusing prosecutors of "want[ing] to exploit the incident for political enhancements or just ... allow(ing) their racist attitudes to secrete from the depth of their ingrained self." Francisco "El Comanche" Gonzales, "Racist Remarks," *Taos News*, July 7, 1994.

111. There is sufficient evidence in the record to support a finding that political factors, and their coverage in the Taos media market, weighed in favor of a venue change in this case.

### 4. *Presence of "Fixed Opinions"*

112. In *Chamberlain*, 112 N.M. at 726, 819 P.2d at 676 (quoting *State v. McGuire*, 110 N.M. 304, 311, 795 P.2d 996, 1003 (1990)), our Supreme Court stated that "[e]xposure of venire members to publicity about a case by itself does not establish prejudice[,]" and therefore courts must also inquire as to whether such exposure caused jurors to have " 'such fixed opinions that they could not judge impartially the guilt of the defendant.' " However, insofar as such "fixed opinions" involve the subjective mental states of people in the Taos community, they are seldom, if ever, susceptible to direct proof, and therefore may be proved by circumstantial evidence. *See State v. Manus*, 93 N.M. 95, 98, 597 P.2d 280, 283 (1979) (applying this principle to element of crime requiring proof of a defendant's intent), *overruled on other grounds by Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982); 21 Am.Jur.2d *Criminal Law* § 381 (noting that no witness can swear as a matter of fact, independent of his judgment,

that local prejudice exists in the minds of county inhabitants); *1980 ABA Standards, supra* § 8–3.3 (allowing various forms of circumstantial evidence).

113. In this case, the trial court had before it expert testimony regarding public opinion polls taken in Taos County after the first trial in July 1994, published statements by members of the Taos community including past and current elected representatives, and the evidence adduced during jury selection at two prior mistrials in Taos County. The State's polling expert opined that, after the first trial, "88 percent of the people in Taos County know who [Defendant] is or about the incident he was involved in, and this level of awareness could impact on ... the court's ability to impanel an impartial jury." The trial court could reasonably infer the presence of "fixed opinions" among prospective jurors in Taos County from this expert testimony and public opinion polling. *See 1991 ABA Standards, supra* § 8–3.3.

114. As noted, past and current elected representatives from Taos County made public comments that accused the prosecution of harboring racial bias and engaging in "jury chasing." Other individuals from Taos County, including some jurors and prospective jurors, also had their opinions regarding the case published in the media. It was reasonable for the trial court to infer that the elected representatives from Taos who voiced their opinions in the media were representing the views of their constituents.

115. The trial court also had the benefit of all the evidence adduced during jury selection at the two prior mistrials in Taos County. At the first trial, approximately forty percent of the 90 prospective jurors were removed for cause. The transcript of the voir dire in the first mistrial indicates that several jurors had read or heard media coverage about the case and formed opinions. A significant percentage of jurors were removed for cause from the second mistrial as well. During voir dire, defense counsel stated that "most of you have read about [the case] it appears from your questionnaires." The statistics from juror selection in the first two mistrials could support a reasonable inference that the requisite juror impartiality

could not be obtained for a third trial in Taos County. *See Williams*, 259 Cal.Rptr. at 482–83, 774 P.2d at 155–56.

116. Prospective jurors in the first mistrial made several statements indicating their belief that the case had racial or emotional overtones which led them to sympathize with Defendant. These statements by individual Taos residents also support the inference that there were "fixed opinions" which would frustrate any further attempt to seat an impartial jury at a third trial in Taos County.

117. In addition, the voir dire from the two prior mistrials, which involved detailed juror questionnaires and individual sequestered voir dire of some prospective jurors, supports a reasonable inference that, even with such protective measures in place, the voir dire of a third Taos County jury pool would be no more reliable than the other evidence that the trial court already had accumulated in the record regarding public excitement and local prejudice in Taos County. *See 1980 ABA Standards, supra* § 8–3.3. Some jurors appeared to be guided toward "the right answer" by the lawyers' leading questions. Others indicated that they wanted to serve on the jury to have "input" on the case even though they had already formed opinions about it. Many prospective jurors expressed ambivalence about their opinions, vacillated back and forth on the question of whether they could be impartial, or insisted they could be fair and impartial even though they had strong opinions about the case. Under these circumstances, the trial court did not abuse its discretion in moving Defendant's third trial from Taos County.

### C. Conclusion

118. Because I would not find an abuse of discretion where the trial court followed the correct legal standard for granting a change of venue under Section 38–3–3 and premised its ruling on detailed factual findings which are amply supported by substantial evidence, I respectfully dissent from the majority's conclusion that it was reversible error to move Defendant's third trial from Taos County. I concur in the majority's affirmance of Defendant's DWI conviction.